1   MARC M. SELTZER (54534)
    mseltzer@susmangodfrey.com
2   STEVEN G. SKLAVER (237612)
    ssklaver@susmangodfrey.com
3   SUSMAN GODFREY L.L.P.
    1900 Avenue of the Stars, Suite 1400
4   Los Angeles, CA 90067
    Telephone: (310) 789-3100
5   Facsimile: (310) 789-3150

6   ROBERT J. WASSERMAN (258538)
    rwasserman@mayallaw.com
7   WILLIAM J. GORHAM (151773)
    wgorham@mayallaw.com
8   MAYALL HURLEY P.C.
    2453 Grand Canal Boulevard
9   Stockton, California 95207-8253
    Telephone: (209) 477-3833
10  Facsimile: (209) 473-4818

11  Attorneys for Plaintiffs
12  (Additional Counsel for Plaintiffs Listed on Signature Page.)

13              UNITED STATES DISTRICT COURT

14              CENTRAL DISTRICT OF CALIFORNIA

15

16  CURTIS MARKSON, MARK                Case No.: 5:17-cv-01261-VAP (SPx)
    MCGEORGE, CLOIS MCCLENDON,
17  and ERIC CLARK, individually and on  **THIRD AMENDED CLASS ACTION
    behalf of all others similarly situated,  COMPLAINT FOR:**
18
            Plaintiffs,                  **1. VIOLATION OF THE SHERMAN
19                                            ACT**
    vs.                                  **2. VIOLATION OF THE
20                                            CARTWRIGHT ACT**
    CRST INTERNATIONAL, INC., CRST       **3. UNREASONABLE CHARGES AND
21  EXPEDITED, INC.; C.R. ENGLAND,           PENALTIES ASSOCIATED WITH
    INC., WESTERN EXPRESS, INC.,             TRAINING FOR CDL LICENSES**
22  SCHNEIDER NATIONAL INC.,             **4. UNLAWFUL, UNFAIR OR
    SOUTHERN REFRIGERATED                     FRAUDULENT BUSINESS
23  TRANSPORT, INC., and DOES 1-100,         PRACTICES**
    inclusive,                           **5. VIOLATION OF LABOR CODE
24                                            SECTIONS 2802**
            Defendants.                  **6. VIOLATION OF LABOR CODE
25                                            SECTIONS 201 & 202**
                                         **7. PRIVATE ATTORNEYS GENERAL
26                                            ACT**

27                                       <u>**JURY TRIAL DEMANDED**</u>

28

5935969v1.doc

Plaintiffs Curtis Markson, Mark McGeorge, Clois McClendon, and Eric Clark, by and through their undersigned counsel, bring this class action on behalf of themselves and all others similarly situated, and allege as follows:

**INTRODUCTION**

1.      Trucking companies have conspired to restrain competition among themselves in order to suppress compensation of their own workers. In *per se* violations of federal and California antitrust laws, defendants CRST International, Inc., CRST Expedited, Inc., C.R. England Inc., Western Express, Inc., Schneider National, Inc., Southern Refrigerated Transport, Inc., and Does 1 through 100 colluded to deprive thousands of their workers of better compensation and deny them opportunities to advance their careers at other companies. The conspiracy deprived plaintiffs and other Class members of millions of dollars in compensation while generating millions of dollars in revenues for defendants gained through the plaintiffs' hard work for these defendants.

2.      To accomplish their anticompetitive goals, defendants agreed to limit recruiting activities that otherwise would have existed absent the defendants' conspiracy. Defendants entered into a "no-poaching" conspiracy whereby they agreed not to hire employees who remain "under contract" with another trucking company. The "under contract" designation is used for individuals who attended one of defendants' driver training schools or were offered reimbursement for their driver training courses. If the driver remains employed with the defendant for a certain period, then certain of the driver training school tuition costs are waived. But if the driver is terminated or quits before the end of that period, he or she must repay the company thousands of dollars for the tuition costs. And until that amount is repaid, the driver is deemed to be "under contract," despite the fact that their employment has ended. CRST, as defined below, for example, maintains a list called the "Term Student Report" which is updated daily and identifies all individuals who remain "under

contract." That list is used by CRST and the other defendants to deprive those individuals of the opportunity to work elsewhere.

3. In further restraint of competition, defendants' contracts preclude individuals who are "under contract" from working for any other trucking company until his or her tuition is fully repaid. For example, CRST's contract provides, "unless and until Student has repaid all amounts owed under this Agreement, Student will neither seek nor accept any work, as an employee, independent contractor, or otherwise, from any motor carrier other than [this trucking company]."

4. When considering hiring new individuals, defendants regularly communicate with each other to determine whether an applicant is "under contract" with any trucking company. If so, they *refuse to hire* the individual even though he or she is currently unemployed and otherwise meets the company's hiring criteria. This agreement not to hire each other's current or former employees who remain "under contract" is a *per se* violation of federal and California antitrust laws.

5. To further stymie recruitment and competition, defendants refuse to release pertinent information including educational records such as trucking school diplomas and certifications of completion to prospective employers while the tuition remains unpaid.

6. Defendants' conduct also violates California law that precludes agreements restricting employment. For example, in another action pending against CRST, this Court ruled that CRST's non-competition clause "violates § 16600" because binding Ninth Circuit law "prohibits any 'restraint of a substantial character,' regardless of the form." *Fisher v. CRST Van Expedited Inc.*, Case No. 5:15-cv-00878-VAP (SPx), Dkt. No. 47 at 19 (C.D. Cal. May 4, 2016).

7. Defendants' no-poach agreement is a *per se* violation of the antitrust laws. The United States Department of Justice ("DOJ") recently issued a warning that no-poach agreements are *per se* violations, and that it will prosecute them criminally. Specifically, the DOJ warned that it "will criminally investigate allegations that

employers have agreed among themselves on employee compensation or not to solicit or hire each others' employees." The DOJ also confirmed that "An agreement among competing employers to limit or fix the terms of employment for potential hires may violate the antitrust laws if the agreement constrains individual firm decision-making with regard to wages, salaries, or benefits; terms of employment; or even job opportunities."

8.    Defendants' conspiracy had the purpose and effect of suppressing compensation by limiting the hiring and lateral mobility of all motor carrier drivers who remain "under contract". By doing so, defendants eliminated all competition for hiring drivers who remain "under contract". That is true regardless of whether the applicant was currently employed or unemployed. Defendants enforced their agreement by monitoring the hiring practices of competing trucking companies and attempting to prevent the hiring of any "under contract" truckers. For example, C.R. England and CRST would send letters to other trucking companies informing them that the applicant remains "under contract" and threatening litigation if the other company did not abide by the no-poach agreement. Likewise, in furtherance of their conspiracy, other defendants have enforced this policy by refusing to hire drivers that remain "under contract" with the other defendants.

9.    Defendants' conspiracy unreasonably restrains trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 *et seq.*, and constitutes unfair competition in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq*. By this action, plaintiffs seek to recover the difference between the compensation that Class members were paid and what Class members would have been paid absent defendants' illegal conduct, and to enjoin defendants from continuing to engage in their unlawful conduct.

10.    Plaintiffs also allege that defendants CRST International and CRST Expedited (collectively, "the CRST Defendants") have engaged in unlawful, unfair or

4

fraudulent business practices. These unlawful, unfair or fraudulent business practices include, but are not limited to (a) knowingly using false and misleading advertising to induce drivers to enter into a standard form Pre-Employment Driver Training Agreement and Driver Employment Contract (the "Driver Training Agreement"), (b) utilizing the harsh terms of the Driver Training Agreement to keep drivers trapped in employment agreements and penalize them for leaving their employment, (c) charging drivers more than they actually paid for their driver training, (d) charging drivers for U.S. Department of Transportation ("DOT") physical and drug screening tests and other administrative fees, (e) not giving drivers credit for the reduced rate at which they were are paid, and (f) not giving drivers credit for amounts repaid through payroll deductions.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. §§ 4, 16 and 22, 28 U.S.C. §§ 1331 and 1337. This Court has supplemental jurisdiction over the claims brought under the laws of the State of California pursuant to 28 U.S.C. § 1367 since the matters at issue with respect to the state law claims form part of the same case or controversy.

12.    This Court has personal jurisdiction over defendants because each resides in, is found in or has a principal place of business in the State of California, employed Class members in California, conducts business in California, and substantial parts of the conduct at issue took place in, originated in, or were implemented, in whole or in part, within the State of California. Defendants were at all relevant times subject to the jurisdiction of the State of California and their conspiracy was entered into and carried out within the State of California.

13.    Venue is proper in this judicial district under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the acts or omissions giving rise to the claims set forth herein occurred in this district, and a substantial portion of the affected interstate trade and commerce was carried out in this district.

**PARTIES**

14.     Curtis Markson ("Markson"), a California resident, is a former employee of defendant CRST Expedited, Inc.

15.     Plaintiff Mark McGeorge ("McGeorge"), a California resident, is a former employee of defendant CRST Expedited, Inc.

16.     Plaintiff Clois McClendon ("McClendon"), a California resident, is a former employee of defendant CRST Expedited, Inc. and CRST International, Inc.

17.     Plaintiff Eric Clark ("Clark"), a former California and current Texas resident, is a former employee of defendant C.R. England, Inc.

18.     Defendant CRST International, Inc. ("CRST International") is an Iowa corporation and, at all times relevant herein, has conducted and transacted and continues to conduct and transact business in the State of California. CRST International maintains its principal place of business in Cedar Rapids, Iowa.

19.     Defendant CRST Expedited, Inc. ("CRST Expedited") is an Iowa corporation and, at all times relevant herein, was conducting and transacting business in the State of California.[1] CRST Expedited maintains its principal place of business in Cedar Rapids, Iowa.

20.     Defendant C.R. England, Inc. ("C.R. England") is a Utah corporation and, at all times relevant herein, was conducting and transacting business in the State of California. C.R. England maintains its principal place of business in Salt Lake City, Utah.

21.     Defendant Western Express, Inc. ("Western Express") is a Tennessee corporation and, at all times relevant herein, was conducting and transacting business in the State of California. Western Express maintains its principal place of business in Nashville, Tennessee.

---

[1] CRST International and CRST Expedited are collectively referred to herein as "CRST."

6

22.    Defendant Schneider National, Inc. ("Schneider") is a Wisconsin corporation and, at all times relevant herein, was conducting and transacting business in the State of California. Schneider maintains its principal place of business in Green Bay, Wisconsin.

23.    Defendant Southern Refrigerated Transport, Inc. ("SRT") is an Arkansas corporation and, at all times relevant herein, was conducting and transacting business in the State of California. SRT maintains its principal place of business in Texarkana, Arkansas.

24.    Plaintiffs are not aware of the true names and capacities of the defendants sued herein as Does 1 through 100, whether individual, corporate, associate, or otherwise and therefore sues such defendants by these fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and believe, and on that basis allege, that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged and that plaintiffs' and Class members' injuries and damages herein alleged were caused by such defendants. Unless otherwise indicated, each defendant was acting within the course and scope of said agency or employment, with the knowledge and/or consent of the defendant.

25.    Plaintiffs are informed and believe, and on that basis allege, that each of the defendants was acting as the agent, servant, employee, partner or joint venturer of, and was acting in concert with, each of the remaining defendants in doing the things herein alleged, while at all times acting within the course and scope of such agency, service, employment, partnership, joint venture or concert of action. Each defendant, in doing the acts alleged herein, was acting both individually and within the course and scope of such agency or employment, with the knowledge or consent of the remaining defendants.

## HARM TO COMPETITION AND ANTITRUST INJURY

26.    Defendants are each in the business of providing transportation and logistics services throughout the country. That business depends on the labor of tens of thousands of skilled truck drivers. Defendants and the other major trucking companies actively recruit and hire truck drivers each year.

27.    Defendants' conspiracy suppressed plaintiffs' and the Class's compensation and restricted competition in the labor market in which plaintiffs and the other Class members sold their services. It did so through a scheme to preclude soliciting or hiring each other's current and former employees who are deemed to be "under contract."

28.    Defendants' conduct intended to and did suppress compensation. Active solicitation of drivers, including those "under contract," would likely have a significant beneficial impact on drivers' compensation. For example, a driver being solicited by another trucking company will learn about compensation offered by competing trucking companies. And that driver will often inform others of the offer they received, spreading information about higher compensation that can lead to movement by drivers among the companies or negotiation over compensation with their current employer.

29.    Active and unrestricted solicitation similarly affects compensation practices by employers. A firm that actively solicits competitors' employees will learn whether their offered compensation is enough to attract their competitors' employees, and may increase offers to make themselves more competitive. Similarly, companies losing or at risk of losing employees to competitors may preemptively increase their employees' compensation in order to reduce their competitors' appeal.

30.    Information about higher salaries and benefits provided by recruiters for one trucking company to employees of another naturally would increase employee compensation. Restraining active recruitment made higher pay opportunities less transparent to truckers or prevented them altogether, and thus allowed employers to keep wages and salaries down.

31.   As a result of the unlawful scheme, defendants deprived their current and former employees deemed to be "under contract" of the opportunity to have defendants bid to pay higher compensation for that employee's services. The illicit conduct suppressed not only the compensation of the workers seeking a new job, but also that of other "under contract" workers by suppressing the compensation on which defendants based all workers' pay.

32.   It also deprived former employees who were deemed to be "under contract" to one defendant from obtaining any compensation at all from another defendant who refused to hire them. The no-poach agreement thus had a direct adverse impact on employees who were terminated or voluntarily left their employment with defendants but who were deemed by their former employer to still be "under contract." These individuals were precluded from working for any companies in the trucking industry until they repaid their tuition, which was difficult or nearly impossible for these individuals given that they were trained as truck drivers, but could no longer be employed as such.

33.   The effects and injuries caused by all of defendants' agreements impacted all members of the Class who were or are deemed to be "under contract."

34.   For example, CRST paid all employees the same amount based on factors such as the trucker's experience and miles driven as shown in the table below:

| Contract Students: This pay scale applies to contract students in the CRST sponsored training program. It does not apply to those who have prepaid their training costs (see below). | | | | |
|---|---|---|---|---|
| **Length of Experience** The months indicated apply to completed service. | **Split Mileage Pay Scale** | **4,000 miles/wk** | **5,000 miles/wk** | **6,000 miles/wk** |
| 2 months | $0.25 | $500 | $625 | $750 |
| 3-5 months | $0.26 | $520 | $650 | $780 |
| 6-11 months | $0.33 | $660 | $825 | $990 |

35.   On information and belief, the other defendants used a similar pay structure. *See*, *e.g.*, C.R. England Premier Truck Driving School Welcome Packet, https://www.crengland.com/webroot/uploads/2017/02/f-pmrwlcmpkt.pdf.

36.   Defendants' conduct thereby caused the compensation of all their "under contract" employees to be suppressed.

37.   The DOJ recently issued a notice warning that no-poach agreements are *per se* violations of the antitrust laws and that it will prosecute them criminally:

> An agreement among competing employers to limit or fix the terms of employment for potential hires may violate the antitrust laws if the agreement constrains individual firm decision-making with regard to wages, salaries, or benefits; terms of employment; or even job opportunities.
>
> …
>
> Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are per se illegal under the antitrust laws. That means that if the agreement is separate from or not reasonably necessary to a larger legitimate collaboration between the employers, the agreement is deemed illegal without any inquiry into its competitive effects.
>
> …
>
> Going forward, the DOJ intends to proceed criminally against naked wage-fixing or no-poaching agreements. These types of agreements eliminate competition in the same irredeemable way as agreements to fix product prices or allocate customers, which have traditionally been criminally investigated and prosecuted as hardcore cartel conduct. Accordingly, the DOJ will criminally investigate allegations that employers have agreed among themselves on employee compensation or not to solicit or hire each others' employees.

U.S. Dept. of Justice, Antitrust Guidance for Human Resource Professionals, Oct. 2016.

38.    Defendants' restraint on competition is not ancillary to any productive joint venture among the trucking companies. Defendants' restraint is also not justified because defendants are adding a penalty beyond the remedies afforded by law to recoup unpaid amounts from drivers' contracted obligations.

39.    In addition, agreements precluding "under contract" individuals from seeking employment with other trucking companies is invalid under California law. As alleged above, this Court has ruled that "[u]nder the Ninth Circuit's analysis in *Golden*, such a procedure violates § 16600. *Golden* prohibits any 'restraint of a substantial character,' regardless of the form."

## INTERSTATE COMMERCE

40.    During the Class Period, defendants employed or trained plaintiffs and other Class members in California. In fulfilling their duties as drivers, plaintiffs and other Class members drove tracks throughout the United States.

41.    Defendants, plaintiffs and other Class members view labor competition in the trucking industry to be nationwide. Defendants considered each others' wages to be competitively relevant regardless of location, and many Class members moved between states to pursue opportunities at trucking companies.

42.    Defendants' conduct substantially affected interstate commerce.

## ALLEGATIONS REGARDING DEFENDANTS' UNLAWFUL NO-POACH SCHEME

43.    Defendants are some of the nation's largest transportation companies, many of whom generate annual revenues far exceeding $1 billion. Defendants' success, at least in part, is attributable to suppression of their employees' compensation through unlawful no-poach agreements.

44.    In order to work as a truck driver in the United States, an individual must obtain a Commercial Driver's License ("CDL"). CDLs are usually obtained after

11

attending a trucking school. Trucking schools typically last 1 to 4 weeks and cost between $1,500 and $7,000. Several trucking companies, including CRST and C.R. England, offer company-sponsored trucking schools whereby they cover the cost of an individual's trucking school and training costs ("Training Costs") in exchange for a promise to work for a set period of time ("Employment Term"). On information and belief, other defendants offer tuition reimbursement programs whether they operate a company-sponsored trucking school or not. *See, e.g.*, New Truck Drivers, Western Express, Inc., https://www.drivewithwestern.com/students/; How to Pay for Truck Driving School, Schneider, https://schneiderjobs.com/company-drivers/truck-driving-career/pay-for-truck-driving-school; Students, Southern Refrigerated Transport, https://www.southernref.com/students/.

45.     Defendants' businesses depend on the labor of thousands of qualified truckers. One key practice to ensure an adequate supply of trained truckers is to train them through company-sponsored training courses. For example, C.R. England has attributed its significant growth to its driver training schools: "Without a steady source of drivers we had no chance of becoming a major player in the industry. We were one of the first carriers to open our own schools. This was taking a risk, but it paid off in a big way."

46.     Defendants conspired to suppress the compensation paid to their trucker employees. To accomplish their goals, defendants entered into a scheme not to hire anyone who remains "under contract" with another trucking company. The purpose and effect of the no-poach agreement was to suppress employees' wages (a) during the period they remained "under contract" while employed by a defendant, and (b) after they ceased working for a defendant if they were deemed to remain "under contract."

47.     This suppression of wages during the "under contract" period is exemplified, for example, during deposition testimony provided by a corporate representative of CRST:

Q.   Are those [recruiting] costs not defrayed by the lower rate at which contract drivers are paid compared to prepaid students and students who already have their license?

A.   They are, to me, unrelated.

Q.   Are you able to testify as to why contract students are paid at a lower rate than the prepaid and noncontract students?

A.   My understanding of driver wages is, it is based on the market conditions. So to be competitive in each of those realms of recruiting and retention of drivers, there's a market average that we look to stay close to or within. And that is a competitive wage in the contract student market. But in order to be competitive in a noncontract or experienced driver market, the pay differs, and that is similar at all carriers. At least that I've seen, in my understanding.

Deposition of Jennifer Abernathy, Sept. 14, 2017, 44:7-24.

48.   In order to qualify for trucking school, defendants require that driver recruits sign an agreement promising they will work as a truck driver for specified period of time to "pay back" their trucking school tuition. For example, driver recruits may sign an employment contract promising that they will work as a truck driver for a specified period of time (e.g., 10 months for CRST, 9 months for C.R. England). The agreements specify that if a driver recruit is dismissed or voluntarily withdraws from employment before completing the specified employment term, he or she must repay all amounts advanced for, amongst other things, trucking school tuition and costs incurred in training them ("Training Costs"). These Training Costs become immediately due and payable upon any dismissal or withdrawal from employment. If these Training Costs are not paid within a set period of time, driver recruits are held responsible for any and all costs incurred in collecting and enforcing the agreement including, but not limited to, interest, attorneys' fees and costs.

49.     Pursuant to defendants' no-poach agreements, the "under contract" designation is used for individuals who attended a defendant's driving school or who owe Training Costs to a defendant as a result of having attended a truck driving training school. If the driver remains employed with the trucking company for a defined period, then most of the Training Costs are waived. But if the driver is terminated or quits before completing the specified period, he or she must repay the company thousands of dollars for the tuition. Until the tuition is repaid in full with interest, the driver is deemed to remain "under contract." Critically, this is true *even if the trucker is terminated, ineligible to return to work for the company in question, or unemployed*.

50.     Defendants communicate with each other concerning all new trucker applicants. If they learn that an applicant remains "under contract" to another trucking company, then they are denied a job pursuant to the no-poach agreement. Again, this is true even though the applicant is currently unemployed and otherwise satisfies all qualifications for employment at the prospective employer company.

51.     Soliciting qualified potential employees, including those who recently completed a training course or who are recent hires for a competitor company is a key tool in a properly functioning labor market, especially in the trucking industry where turn-over is high and qualified drivers are in high demand. But defendants' no-poach agreement eliminated *all* competition among defendants for a certain category of employee—those who remain "under contract." If each defendant was truly acting in its own self-interest, it would actively solicit and employ the others' employees, including those "under contract." Unemployed drivers who have already obtained their CDLs but remain "under contract" should be desirable targets attractive for employment because the prospective employer could acquire an already qualified driver. That competition did not happen however because of the no-poach agreement.

52.     Defendants' scheme to restrain competition included checking with each other to determine whether a particular applicant was "under contract" with another

14

defendant. If an applicant was determined to be "under contract" with another defendant, then any offer of employment would be revoked or not extended. Again, if defendants were acting in their independent self-interest, they would not inform their competitors that they were offering jobs to the competitor's current or former employees, nor would they be dissuaded from hiring a qualified applicant that was "under contract" with a competitor.

53.    McClendon's experience exemplified how the conspiracy works. In September 2016, McClendon attended CRST Expedited's trucking school in Fontana, California, obtained a CDL, signed an employment contract, and agreed to work for CRST Expedited for a 10-month period. Pursuant to his employment contract, if McClendon separated from CRST Expedited within the 10-month period, he would be required to pay CRST Expedited his trucking school tuition and costs incurred in training him to become a truck driver. However, McClendon was not told that that if he did not repay these costs, that he would be *unable to work for any other company* that was a party to the conspiracy alleged herein.

54.    McClendon was terminated a few weeks after completing his training with CRST because of an at-fault accident. Thereafter, McClendon immediately began reaching out to other trucking companies regarding employment.

55.    One prospective employer, Western Express, initiated the hiring process and even told McClendon that she would send him a bus ticket for transportation to its facility. However, Western Express refused to hire McClendon because he was "under contract with CRST," and Western Express could not "bring you in until you are released from that contract." The following messages were exchanged between McClendon and Western Express:



Ashley@Western Express, Inc.:
my processor is moving slow. I'll call
tomorrow to get your bus ticket.
1:35 PM

Ok love thanks a million
1:51 PM



— Fri, 10/21/2016 —



Ashley@Western Express, Inc.:
Hey, you're under contract with
CRST. We are unable to bring you in
until you are released from that
contract. Call CRST.
6:50 AM

56.    Even after the McClendon explained that that simply means that he still owes CRST money, Western Express refused to hire him:

That just means I have to pay them
off is all.which is why I need to work
6:51 AM





Ashley@Western Express, Inc.:
No, it means by law we can't hire
you until after you're released from
the contract or we could be sued by
CRST.
6:54 AM

57.    When McClendon offered to provide proof of his termination Western Express confirmed that "[CRST] will need to release you from your contract, not just terminate you."

58.     McClendon approached another prospective employer, C.R. England. He received the following notice from C.R. England informing him that he is enrolled for the new trucker training:



**Congratulations Clois**

**Your Personal ID Number is : 2876241**

Please use your Personal ID number when calling or emailing C.R. England to ensure we can take care of you without delay.

You have met our preliminary qualifications to attend Orientation at our C.R. England facility in Fontana, CA! You are scheduled to be in our orientation, starting Monday April 24, 2017 at 6:00 A.M. Please be advised that there are some additional requirements you will need to meet in order to obtain employment with C.R. England. If you fail to bring your DOT Med Card & Long Form, a DOT physical will be conducted at our facility. You will need to pass an eye exam with 20/40 vision (with or without corrective lenses) and have a blood pressure rating of 140/90 (or less). C.R. England is required to administer drug testing once you arrive at the facility to be in compliance with DOT. Additionally, you will be required to pass a road and backing evaluation and a functional capacity test.

59.     But the next day, C.R. England informed McClendon that he was ineligible for employment because CRST reported that he remains "under contract" with CRST. C.R. England sent the following message to McClendon:

---------- Forwarded message ----------
From: **Robyn Harper** <Robyn.Harper@crengland.com>
Date: Friday, April 21, 2017
Subject: Ineligible for hire
To: "clois.mcclendon85@gmail.com" <clois.mcclendon85@gmail.com>


CRST is reporting that you are still under contract, I will not be able to hire you till your contract has been satisfied.


*Robyn Harper*

*Hiring Specialist*

60.     In June of 2017, Clark attended Premier Truck Driving school in Fontana, California, obtained a CDL, signed an employment contract, and agreed to work for

17

C.R. England for a 9-month period. Pursuant to his employment contract, if Clark was to separate from C.R. England within the 9-month period, he would be required to repay to C.R. England his Training Costs. However, Plaintiff Clark was not told that that, if he did not repay these Training Costs, he would be *unable to work for any other trucking company*.

61.     Clark was terminated by C.R. England just a few weeks after completing his training because of an at-fault accident. Thereafter, Clark immediately began reaching out to other carriers regarding employment. One prospective employer, Schneider, initiated the hiring process but refused to proceed or hire Clark because he was "under contract with C.R. England".

62.     Another prospective employer, SRT, also initiated the hiring process but refused to proceed or hire Clark because he was "under contract with C.R. England".

63.     Markson attended a Driver Training Program sponsored by CRST Van Expedited in October 2012. After completing the program and spending approximately three months on the road, Markson was called back for retesting by the DMV. Markson failed that test.

64.     Thereafter, Markson's license lapsed, his employment with Defendants ended, and CRST began efforts to collect amounts advanced under the Pre-Employment Driver Training Agreement.

## ADDITIONAL CRST-SPECIFIC ALLEGATIONS

65.     CRST International is the parent corporation of eight integrated operating companies that work together to span the transportation industry. CRST International's operating companies include CRST Expedited, CRST Malone, Inc., CRST Logistics, Inc., CRST Dedicated Services, Inc., CRST Specialized Transportation, Inc., BESL Transfer Company, Pegasus Transportation, and Gardner Trucking.

66.     CRST recruits individuals to obtain commercial drivers' licenses and work for its operating companies by means of print, radio, television and internet advertising. CRST International touts that it offers prospective drivers a "successful, professional

truck driving career" and invites individuals to select which of its operating companies they want to drive for.

67.   CRST further promises "job stability and job security," representing that their driver teams "average the most miles per truck in the industry." CRST further promised "industry-leading pay," "a sign-on bonus," and "[m]edical coverage from Day One," "[a]ccident and disability insurance," "[p]aid vacations," "[f]ree live insurance" amongst a host of other benefits.

68.   As one of the nation's largest families of motor carriers, CRST trains thousands of new drivers every year. Interested individuals are offered the opportunity to earn their Commercial Driver's License in Cedar Rapids, Iowa or through one of several driver training schools CRST partners with throughout the country.

69.   With more than 3,500 drivers, CRST Expedited operates one of the industry's largest fleets of drivers.

70.   Individuals interested in driving for CRST Expedited are funneled to the website joincrst.com, a hotline, or one of CRST Expedited's recruiters.

71.   Individuals interested in driving for CRST Expedited who do not have CDLs are then presented with two training options:

> "Option 1: 100% sponsored training at an accredited school with one of the shortest employment commitments in the industry."
>
> Option 2: $6,500 initial price gets you top-quality training, higher wages, and a competitive sign-on bonus."

72.   Prospective drivers who select option 1, (referred to by CRST as "Student Drivers") are placed in CRST Expedited's Driver Training Program.

73.   CRST Expedited operates a training facility in Cedar Rapids, Iowa and partners with several other training schools throughout the country (referred to as the "Educational Facility"). Student Drivers who reside in California and some of its surrounding states are funneled to the Educational Facility known as the Advance School of Driving in Fontana, California.

19

74.   CRST Expedited's Driver Training Program consists of four phases: Phase 1 consists of driver training at the Educational Facility; Phase 2 is CRST Expedited's orientation program held at a site selected by CRST Expedited; Phase 3 is CRST Expedited's finishing school consisting of hands on over-the-road driving training with one of CRST Expedited's lead drivers; and Phase 4 is CRST Expedited's professional development program, which consists of specialized classroom training and a mentoring program conducted by CRST Expedited's operations transition team.

75.   Once at an Educational Facility, Student Drivers are required to sign CRST Expedited's Pre-Employment Driver Training Agreement.

76.   A copy of the Pre-Employment Driver Training Agreement provided to and signed by McGeorge is attached hereto as Exhibit 1.

77.   Pursuant to CRST Expedited's Pre-Employment Driver Training Agreement, Student Drivers are advanced tuition as well as transportation, lodging and other expenses. *Id.* at ¶ 7-11.

78.   As defined in the Pre-Employment Driving Training Agreement, Transportation Costs for Phase 1 means the costs incurred for Student Drivers to travel from their homes to the Educational Facility. Transportation Costs for Phase 2 are the costs incurred to transport Student Drivers from the Educational Facility to the site where the orientation program takes place. *Id.* at ¶ 7.

79.   Similarly, Lodging Costs mean the hotel or motel rate charged for Student Drivers staying in rooms made available to them at a hotel or motel selected by CRST Expedited per an arrangement with the hotel or motel. *Id.* at ¶ 8.

80.   Under the Pre-Employment Driving Training Agreement, if Student Drivers are dismissed or voluntarily withdraw from the Driver Training Program before commencing Phase 3, they must repay the full amounts advanced for tuition, lodging, and transportation, as well as their DOT physical and drug screening tests. These amounts become immediately due and payable upon any dismissal, breach or withdrawal from the Driver Training Program. If these amounts are not paid within

thirty days, Student Drivers are also responsible for any and all costs incurred in collecting and enforcing the Pre-Employment Driver Training Agreement including, but not limited to, interest, attorneys' fees and costs. *Id*. at ¶ 12, subsection b.

81. Further, if, within the initial ten month term of their employment, (a) they breach the Driver Employment Contract, or (b) are terminated for cause, then Student Drivers will owe and immediately must pay to CRST Expedited (i) $6,500, plus (ii) the amounts advanced by CRST Expedited on their behalf for the DOT physical and drug screening tests, lodging and transportation costs not yet repaid, plus (iii) interest commencing as of the first day of employment under the Driver Employment Contract. *Id*. at ¶ 12, subsection e, (2).

82. Under the Pre-Employment Driving Training Agreement, Phase 3 and Phase 4 are completed only if the Student Driver and CRST Expedited execute a Driver Employment Contract, and after the Student Driver successfully completes Phase 1 and Phase 2. Once executed, Student Drivers become employees of CRST Expedited (referred to as "Drivers").

83. A copy of the Driver Employment Contract provided to and signed by Markson is attached hereto as Exhibit 2.

84. CRST Expedited's Driver Employment Contract provides for a term of ten months ("Employment Term").

85. During this time, Drivers may be terminated with or without cause, by mutual agreement, or upon their death. Cause is defined as a Drivers' breach of the Driver Employment Contract or failure to satisfy or comply with any standards, requirements, or obligations set forth in the CRST Professional Driver's Handbook. *Id*. at ¶ 4.

86. Under the Driver Employment Contract, Drivers agree to reimburse CRST Expedited amounts "advanced on behalf of Employee, in accordance with the Pre-Employment Driver Training Agreement, the payment of certain tuition, lodging,

transportation, and other expenses and fees incurred by Employee in the course of Employee participating in the Driver Training Program. . ." *Id*. at ¶ 6.

87.     Specifically, Drivers agree to begin reimbursing CRST Expedited for the advances referenced above following their completion of Phase 3. *Id*. at ¶ 6, subsection a. Once qualified as a Company Driver, CRST Expedited begins deducting up to $40.00 per week from Drivers' paycheck to repay the amounts advanced during Phase 1 of the Driver Training Program. *Id*. These deductions include the cost of their DOT physical and drug screening tests and continue until Drivers have repaid the entire principal amount, plus interest.

88.     Further, in the event that Drivers breach the Driver Employment Contract or are terminated for cause (something judged exclusively by CRST Expedited), they must immediately pay CRST Expedited (i) $6,500, plus (ii) the amounts advanced for DOT physical and drug screening tests, lodging and transportation, plus (iii) interest. Again, Drivers are also responsible for any and all costs incurred by CRST Expedited in collecting and enforcing these amounts. *Id*. at ¶ 6, subsection b.

89.     After a short stint with CRST in 2012, Markson decided to return in Fall of 2016 and was required to participate in the Driver Training Program.

90.     During Phase 1 of his training, Markson entered into a Pre-Employment Driver Training Agreement with CRST Expedited.

91.     At the completion of Phase 2, Markson and the other Student Drivers signed CRST Expedited's Driver Employment Contact.

92.     After he completed the training and started driving, Markson quickly discovered that he was not making anywhere near the money he was led to believe he would make according to CRST's representations.

93.     CRST also deducted the cost of his drug screening test from his pay.

94.     In or around February 2017, Markson secured employment with another trucking company. On March 2, 2017, Markson was charged $6,500 against his earned

wages. The charge was coded "LS" which stands for "SCHOOL CONT. BALANCE". CRST employed a collections agency to pursue the unpaid amount.

95.     Markson did not receive any credit against the $6,500 for the portion of the Employment Term that he worked for CRST or the reduced rate at which he was paid.

96.     McGeorge became interested in a career in truck driving in Fall of 2016. After submitting his resume online, one of CRST's recruiters contacted McGeorge. McGeorge was told that he would not be charged for his DOT physical or drug screening tests, that he would only have to pay back $40 per week for the first ten months and that, if he stayed past ten months, the remainder of his debt would be forgiven.

97.     When he reported to the Educational Facility, McGeorge found things very different than previously represented. McGeorge was apprised of additional amounts that he and the other Student Drivers would be charged for, including their DOT physical, drug screening tests, and lodging.

98.     Notwithstanding the foregoing, McGeorge signed CRST Expedited's Pre-Employment Driver Training Agreement and began CRST's Driver Training Program.

99.     McGeorge and other Student Drivers received very little one-on-one training and even less time behind the wheel. When behind-the-wheel training was provided, McGeorge and the other Student Drivers spent the majority of their time waiting for their turn rather than receiving actual instruction. Throughout the entire Driver Training Program, McGeorge received only approximately 5 to 6 hours of actual behind-the-wheel training.

100.    After completing the first two phases of CRST Expedited's Driver Training Program, McGeorge executed CRST Expedited's Driver Employment Contract, was paired with a driver trainer, and sent off on his over-the-road training.

101.    Thereafter, CRST Expedited began making deductions from his already meager pay. These deductions included a "PHYS/DRUG SCREEN" charge (associated

with the amounts advanced under the Pre-Employment Driver Training Agreement), a "HOUSING FEE" (associated with the lodging he received during Defendants' Driver Training Program), and an unidentified deduction coded simply "PE".

102.  Although $75 had already been deducted from his wages for "HOUSING FEE", and although he only incurred $330 in housing costs during the Driver Training Program, McGeorge was charged a $420 "HOUSING FEE" on his February 28, 2017 wage statement.

103.  CRST Expedited's other Drivers were subjected to similar unlawful deductions and chargebacks. These included fees and costs associated with pre-employment medical or physical exams, fees as well as other miscellaneous items.

104.  Because he was not making the money represented by CRST to induce him into their employment, McGeorge also left his employment with CRST Expedited.

105.  When McGeorge left his employment, CRST unlawfully deducted from his final paycheck all of the wages he had earned that pay period and applied it to the $6,500 fee assessed against him.

106.  This deduction from McGeorge's pay was made pursuant to CRST's longstanding and uniform policy of deducting wages from the final paychecks of Drivers and Student Drivers who did not complete the Employment Term.

107.  As it did with Markson, CRST has retained a firm to collect the amounts purportedly owed to CRST Expedited.

108.  CRST uses the Pre-Employment Driver Training Agreement and Driver Employment Contract as an illegal means to manipulate and control the Student Drivers and Drivers. CRST's scheme first involves inducing individuals into entering the contracts by knowingly making false and misleading representations about what employment will entail as well as intentionally failing to disclose relevant information such as high turnover rates and low average pay/miles amongst Student Drivers and Drivers. Once employed, CRST then uses the harsh terms of the Pre-Employment

Driver Training Agreement and Driver Employment Contract to trap Student Drivers and Drivers in their employ, and to penalize those that leave.

109.   The Pre-Employment Driver Training Agreement and Driver Employment Contract are both procedurally and substantively unconscionable.

110.   The contracts are contracts of adhesion presented to Student Drivers on a take-it-or-leave-it basis, often after Student Drivers have already invested significant time and effort into the Driver Training Program. Worse, Student Drivers who do not complete Phase 1 and Phase 2 must immediately pay the amounts advanced for their tuition, lodging, transportation, DOT physical and drug screening tests, and other administrative fees. Similarly, Drivers who do not complete Phase 3, Phase 4 and the entire 10-month contract, must immediately pay the sum of $6,500, plus the amounts advanced for their DOT physical and drug screening tests, transportation, lodging and other administrative fees not already deducted from their pay.

111.   The $6,500 penalty charged to Drivers who do not complete the 10-month contract is unreasonable, not representative of the actual cost of CRST's Driver Training Program or the value provided to the Drivers, and is intended to discourage Drivers from ending their employment with CRST and penalize those that do.

112.   On information and belief, the $6,500 penalty charged to Drivers who do not complete the 10-month contract also, or alternatively, is an attempt by CRST to impermissibly pass business expenses onto Drivers.

113.   The costs charged to Student Drivers and Drivers for their DOT physical and drug screening tests and other administrative fees are unreasonable, not representative of their actual cost to CRST or the value provided to the Drivers, and are intended to discourage Drivers from ending their employment with CRST and penalize those that do.

114.   The costs charged to Student Drivers and Drivers for their DOT physical and drug screening tests and other administrative fees also constitute unlawful

25

chargebacks and deductions under California Labor Code §§ 221, 222.5, 224, 231 and 2802.

115. Because CRST willfully makes unlawful deductions from Student Drivers' and Drivers' wages, CRST has willfully failed to pay its Drivers and Student Drivers all wages earned and unpaid at resignation or termination, in violation of California Labor Code §§ 201 and 202.

116. CRST recoups all or part of the amounts advanced on behalf of the Student Drivers and Drivers during Phase 3 of the Driver Training Program and the remainder of their 10-month contract via reduced per mile rates.

117. Notwithstanding the foregoing, drivers whose employment ended before the completion of their 10-month contract received no credit for the same and remained liable for the entire $6,500 as well as the amounts advanced for their DOT physical and drug screening tests, transportation, lodging and other administrative fees not already deducted from their pay.

118. During the four years prior to the filing of this action, CRST had agreements with truck driving schools to pay significantly less than $6,500 tuition for each Student Driver who participates in the Driver Training Program. CRST paid Advance School of Trucking just $1,500 during the pertinent time period. On information and belief, the actual and reasonable cost of the trucking school to CRST is somewhere between $2,000 and $2,500.

119. CRST did not inform Student Drivers or Drivers, in the Pre-Employment Driver Training Agreement or Driver Employment Contract or otherwise, that they actually paid significantly less than the $6,500 purportedly advanced to them for their tuition.

120. CRST did not inform plaintiffs, Student Drivers or Drivers, in the Pre-Employment Driver Training Agreement or Driver Employment Contract or otherwise, that the $6,500 figure was set without regard to the actual costs incurred by CRST or,

26

alternatively, so as to impermissibly pass costs and fees for which CRST is legally responsible onto Drivers.

121.   The provisions of the Pre-Employment Driver Training Agreement and Driver Employment Contract requiring payment of the $6,500 constitute an illegal penalty clause or illegal liquidated damages clause under California Civil Code § 1671.

122.   The provisions of the Pre-Employment Driver Training Agreement and Driver Employment Contract requiring payment of the $6,500 tuition also constitute an invalid and unenforceable penalty in violation of California Civil Code § 1671, and are, therefore, an unlawful and unfair business practice because, inter alia, they purport to require the repayment of more than the actual cost of the tuition paid, which sum is not characterized as liquidated damages, and because Student Driver and Drivers whose employment ends before the completion of their 10-month contract are not given credit for tuition costs already paid back through CRST's payment of reduced mileage rates and/or the deductions from their pay.

123.   The provisions of the Pre-Employment Driver Training Agreement and Driver Employment Contract requiring payment of the $6,500 constitute unlawful deductions and chargebacks in violation of California Labor Code §§ 221, 222.5, 224, 231 and 2802.

124.   The provisions of the Pre-Employment Driver Training Agreement and Driver Employment Contract requiring payment of the amounts advanced for DOT physical and drug screening tests and other administrative fees constitute unlawful deductions and chargebacks in violation of California Labor Code §§ 221, 222.5, 224, 231 and 2802.

125.   The provisions of the Pre-Employment Driver Training Agreement and Driver Employment Contract requiring payment of the amounts advanced by CRST Expedited for DOT physical and drug screening test, transportation, lodging and other administrative fees constitute an invalid and unenforceable penalty in violation of California Civil Code § 1671, and are, therefore, an unlawful and unfair business

practice because, *inter alia*, they purport to require the repayment of more than the actual cost of such services and goods, which sum is not characterized as liquidated damages, and because Student Drivers and Drivers whose employment ends before the completion of their 10-month contract are not given credit for amounts already paid back through CRST's payment of reduced mileage rates and/or the deductions from their pay.

126.   The provisions of the Pre-Employment Driver Training Agreement and Driver Employment Contract requiring payment of the amounts advanced by CRST Expedited for DOT physical and drug screening tests and other administrative fees constitute unlawful deductions and chargebacks in violation of California Labor Code §§ 221, 222.5, 224, 231 and 2802, and are, therefore, an unlawful and unfair business practice because, inter alia, they purport to require the repayment of costs and fees not lawfully passed along to drivers.

127.   The provisions of the Pre-Employment Driver Training Agreement and Driver Employment Contract requiring payment of $6,500 in addition to the amounts advanced for DOT physical and drug screening tests, transportation, lodging and other administrative fees also constitute a deceptive business practice because the agreements imply CRST actually paid these amounts, and CRST did not inform Plaintiffs, Student Drivers and Drivers that the actual costs were significantly less.

128.   The provisions of the Pre-Employment Driver Training Agreement and Driver Employment Contract requiring payment of $6,500 in addition to the amounts advanced for DOT physical and drug screening tests, transportation, lodging and other administrative fees also constitute a deceptive business practice because the agreements imply Plaintiffs, Student Drivers and Drivers are permissibly charged for these items.

129.   From at least four years prior to the filing of this action, CRST has adopted and employed unfair business practices. These unfair business practices included knowingly using false and misleading advertising to induce plaintiffs, Student Drivers and Drivers into entering the Pre-Employment Driver Training Agreement and

28

Driver Employment Contract, utilizing the harsh terms of the Pre-Employment Driver Training Agreement and Driver Employment Contract to trap them in their employ and penalize them for leaving, charging plaintiffs, Student Drivers and Drivers more than they actually paid for their Driver Training Program, impermissibly charging plaintiffs, Student Drivers and Drivers for their DOT physicals and drug screening tests, and other costs and administrative fees not lawfully passed on to them, not giving Drivers credit for the reduced rate at which Drivers were are paid, making illegal deductions from their pay, and not giving drivers credit for amounts repaid through payroll deductions.

130.   On February 1, 2018, plaintiffs provided written notice to the California Labor and Workforce Development Agency ("LWDA") and CRST regarding the specific provisions of the California Labor Code alleged to have been violated, including the facts and theories to support those alleged violations. On April 30, 2018, more than 65 calendar days after plaintiffs' written notice, and not having received notice from the LWDA that it intended to investigate their allegations, plaintiffs filed their Second Amended Complaint adding a cause of action under the Private Attorney General Act ("PAGA") to recover penalties against CRST.

## CLASS ACTION ALLEGATIONS

131.   Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. The proposed classes which plaintiffs seek to represent consist of the following:

(a)   All current or former California residents "under contract" as motor vehicle carrier drivers with CRST International, Inc., CRST Expedited, Inc.; C.R. England, Inc., Western Express, Inc., Schneider National, Inc., or Southern Refrigerated Transport, Inc., at any time from May 15, 2013 to the present ("the Class"). Excluded from the Class are officers, directors, senior executives

and personnel in the human resources and recruiting departments of the defendants;

(b)   Included within the class is a subclass of all persons who signed a Pre-Employment Driver Training Agreement or Driver Employment Contract with Defendant CRST Expedited, Inc. and who participated in CRST Expedited, Inc.'s Driver Training Program in California and were charged for their DOT physical and drug screening tests between May 12, 2013 to present (the "CRST DOT Physical and Drug Screening Test Subclass"); and

(c)   Included in the Class is a subclass of all persons who signed a Driver Employment Contract with Defendant CRST Expedited, Inc. and who participated in CRST Expedited, Inc.'s Driver Training Program in California but failed to complete the contractually-required 10-month employment term with CRST Expedited, Inc. and were charged $6,500 (the "CRST Driver Subclass").

132.   Each Class and Subclass of persons is so numerous that joinder of all members is impracticable, and the disposition of their claims in a class action is a benefit to the parties and to the Court. Plaintiffs are informed and believe, and based thereon allege, that there are more than 10,000 persons who satisfy the class definition.

133.   The Class and Subclasses are ascertainable either from defendants' records or through self-identification in a claims process.

134.   Plaintiffs' claims are typical of the claims of other Class and Subclass members as they arise out of the same course of conduct and the same legal theories, and they challenge defendants' conduct with respect to the Class as a whole.

135.   Plaintiffs will fairly and adequately represent the interests of the Class and Subclasses. Plaintiffs have no conflict of interest with any member of the Class and Subclasses. Plaintiffs have retained counsel competent and experienced in complex

class action litigation with the resources and expertise necessary to litigate this case through to conclusion.

136. The case raises common questions of law and fact that are capable of Class-wide resolution, including:

a. Whether defendants agreed not to actively solicit each other's "under contract" employees;

b. Whether such agreements were *per se* violations of the Sherman Act and Cartwright Act;

c. Whether defendants' agreements constituted unlawful or unfair business acts or practices in violation of California Business and Professions Code § 17200;

d. Whether defendants' contracts violate Cal. Bus & Prof. Code § 16600;

e. Whether and the extent to which defendants' conduct suppressed compensation below competitive levels;

f. Whether plaintiffs and the other Class members suffered injury as a result of defendants' agreements;

g. The nature and scope of injunctive relief necessary to restore a competitive market;

h. The measure of damages suffered by plaintiffs and the Class;

i. Whether the Pre-Employment Driver Training Agreement was procedurally and substantively unconscionable;

j. Whether the Driver Employment Contract was procedurally and substantively unconscionable;

k. Whether CRST charged Class members more than they actually paid for their Driver Training Program;

l. Whether CRST failed to credit drivers for the reduced rate at which they were paid;

m. Whether CRST failed to give drivers credit for amounts repaid through payroll deductions;

n. Whether CRST utilized the harsh terms of the Pre-Employment Driver Training Agreement and Driver Employment Contract to trap Class members in their employ or penalize them for leaving;

o. Whether CRST impermissibly charged Class members for their DOT physical and drug screening tests and other fees and costs;

p. Whether CRST impermissibly deducted wages from Class members' final paychecks;

q. Whether CRST willfully withheld wages due and owing to Class members at the time of termination or within 72 hours of resignation; and

r. Whether the Class is entitled to civil and statutory penalties and/or restitutionary relief, and the amount of the same.

137. These common questions predominate over any questions affecting only individual Class members.

138. A class action is superior to any other method available for fairly and efficiently adjudicating the controversy because (1) joinder of individual class members is not practical, (2) litigating the claims of individual Class members would be unnecessarily costly and burdensome and would deter individual claims, (3) litigating the claims of individual Class members would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, (4) Class members still working for defendants may be fearful of retaliation if they were to bring individual claims, (5) Class members would be discouraged from pursuing individual claims because the damages available to them are relatively small, and (6) public policy encourages the use of class actions to enforce employment laws and protect individuals who, by virtue of their subordinate position, are particularly vulnerable.

139.   Judicial economy will be served by maintenance of this lawsuit as a class action. To process numerous virtually identical individual cases will significantly increase the expense on the Court, the Class members and defendants, all while unnecessarily delaying the resolution of this matter. There are no obstacles to effective and efficient management of this lawsuit as a class action by this Court, and doing so will provide multiple benefits to the litigating parties including, but not limited to, efficiency, economy, and uniform adjudication with consistent results.

140.   Defendants' actions are generally applicable to the entire Class. Prosecution of separate actions by individual members of the Class creates the risk of inconsistent or varying adjudications of the issues presented herein, which, in turn, would establish incompatible standards of conduct for defendants.

141.   Injunctive relief is appropriate with respect to the Class as a whole, because defendants have acted on grounds generally applicable to the Class.

142.   Notice of a certified class action and any result or resolution of the litigation can be provided to class members by mail, email, publication, or such other methods of notice as deemed appropriate by the Court.

## STATUTE OF LIMITATIONS

143.   During the relevant statute of limitations period, plaintiffs had neither actual nor constructive knowledge of the pertinent facts of the conspiracy constituting their claims for relief asserted herein. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of any conspiracy.

144.   Defendants' secret conspiracy did not give rise to facts that would put plaintiffs or the Class on inquiry notice that there was a conspiracy among trucking companies to suppress compensation of its workers by agreeing not to compete on hiring a certain type of drivers.

145.   Defendants' conspiracy was concealed and carried out in a manner specifically designed to avoid detection. Defendants concealed and kept secret the illicit anti-solicitation agreements from class members.

146.   Defendants consistently represented to Class members that their compensation was fair and competitive despite knowing that the compensation was in part the product of a collusive market for hiring and retaining truck drivers rather than a fair and competitive one.

147.   These representations lulled plaintiffs and Class members into believing that the compensation paid by defendants was determined in a competitive market.

148.   As a result of defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to the claims that plaintiffs and the Class members have as a result of the anticompetitive and unlawful conduct alleged herein.

<u>**CLAIMS FOR RELIEF**</u>

<u>**FIRST CLAIM FOR RELIEF:**</u>

<u>**VIOLATION OF SECTION ONE OF SHERMAN ACT**</u>

<u>**[15 U.S.C. § 1]**</u>

**(On Behalf of Plaintiffs and the Class)**

149.   Plaintiffs hereby reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein, except as said paragraphs are inconsistent with the allegations of this cause of action.

150.   Defendants, by and through their officers, directors, employees, agents or other representatives, have entered into an unlawful agreement, combination and conspiracy in restraint of trade, in violation of 15 U.S.C. § 1. Specifically, defendants agreed to restrict competition for Class members' services through refraining from solicitation of each other's employees who were "under contract," with the purpose and effect of suppressing Class members' compensation and restraining competition in the market for Class members' services.

151.   Defendants' conduct injured plaintiffs and Class members by suppressing their wages, benefits, and mobility, and depriving them of free and fair competition in the market for their services.

152.   Defendants' agreements are *per se* violations of the Sherman Act.

153.   Wherefore, plaintiff and the other Class members have been injured as set forth above and request relief as hereafter provided.

## SECOND CLAIM FOR RELIEF

## VIOLATION OF THE CARTWRIGHT ACT

### [Cal. Bus. & Prof. Code §§16702, *et seq*.]

### (On Behalf of Plaintiffs and the Class)

154.   Plaintiffs hereby reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein, except as said paragraphs are inconsistent with the allegations of this cause of action.

155.   Defendants, by and through their officers, directors, employees, agents or other representatives, have entered into an unlawful agreement, combination and conspiracy in restraint of trade, in violation of California Business and Professions Code § 16720. Specifically, defendants agreed to restrict competition for Class members' services through anti-solicitation agreements, with the purpose and effect of suppressing Class members' compensation and restraining competition in the market for Class members' services.

156.   Defendants' conduct injured plaintiffs and other Class members by suppressing their wages, benefits, and mobility and depriving them of free and fair competition in the market for their services.

157.   Plaintiffs and other Class members are "persons" within the meaning of the Cartwright Act as defined in California Business and Professions Code § 16702.

158.   Defendants' conspiracy is a *per se* violation of the Cartwright Act.

159.   Wherefore, plaintiff and the other Class members have been injured as set forth above and request relief as hereafter provided.

### THIRD CLAIM FOR RELIEF

**Unreasonable Charges or Penalties Associated with Training Individuals**

**to Obtain their CDL Truck Driver Licenses**

**[Cal. Civil Code § 1671 and Code of Civil Procedure § 1060]**

**(On behalf of Plaintiffs and the CRST Driver Subclass)**

160.   Plaintiffs hereby reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein, except as said paragraphs are inconsistent with the allegations of this cause of action.

161.   California Civil Code § 1671 provides that "a provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made".

162.   Under California Code of Civil Procedure § 1060, "any person interested under a written instrument, . . ., or under a contract, . . ., may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action or cross-complaint in the superior court for a declaration of his or her rights and duties . . , including a determination of any question of construction or validity arising under the instrument or contract. He or she may ask for a declaration of rights or duties, either alone or with other relief; and the court may make a binding declaration of these rights or duties, whether or not further relief is or could be claimed at the time. The declaration may be either affirmative or negative in form and effect, and the declaration shall have the force of a final judgment. The declaration may be had before there has been any breach of the obligation in respect to which said declaration is sought."

163.   As set forth above, CRST's Pre-Employment Driver Training Agreement and Driver Employment Contract are procedurally and substantively unconscionable. They unreasonably call for the repayment of amounts greater than those actually expended by Defendants and do so without (a) apprising Class members of the amounts

actually expended or (b) accounting for amounts collected from the Class. The clauses constitute unreasonable penalties which are injurious to plaintiffs and the Class members.

164.   CRST's course of conduct, act and practice in violation of the California law mentioned above constitutes a violation of § 1671 of the California Civil Code.

165.   Pursuant to California Code of Civil Procedure § 1060, plaintiffs seek a declaration that Paragraph 12, subsection e., (2), of the Pre-Employment Driver Training Agreement is an illegal liquidated damages clause in violation of California Civil Code § 1671.

166.   Pursuant to California Code of Civil Procedure § 1060, plaintiffs seek a declaration that Paragraph 6, subsection b, of the Driver Employment Contract is an illegal liquidated damages clause in violation of California Civil Code section 1671.

167.   Pursuant to California Code of Civil Procedure § 1060, plaintiffs seek a declaration that Paragraph 12, subsection e., (2), of the Pre-Employment Driver Training Agreement is procedurally and substantively unconscionable and therefore unenforceable as against plaintiff's and the other Class members.

168.   Pursuant to California Code of Civil Procedure section 1060, plaintiffs seek a declaration that Paragraph 6, subsection b, of the Driver Employment Contract is procedurally and substantively unconscionable and therefore unenforceable as against plaintiff's and the other Class members.

169.   The harm to plaintiffs and the Student Driver Subclass in being dissuaded from leaving their employment with CRST before the completion of their ten-month contract and/or being penalized for the same outweighs the utility, if any, of CRST's policies and practices.

170.   Wherefore, plaintiffs and the other Class members have been injured as set forth above and request relief as hereafter provided.

## FOURTH CLAIM FOR RELIEF

### Unlawful, Unfair, or Fraudulent Business Practices

**[Cal. Bus. and Prof. Code § 17200 *et seq.*]**

**(On Behalf of Plaintiffs the CRST Driver Subclass)**

171.   Plaintiffs hereby reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein, except as said paragraphs are inconsistent with the allegations of this cause of action.

172.   Section 17200 of the California Business and Professions Code prohibits any unlawful, unfair, or fraudulent business practices.

173.   Section 90.5(a) of the California Labor Code states that it is the public policy of California to enforce vigorously minimum labor standards in order to ensure employees are not required to work under substandard and unlawful conditions, and to protect employers who comply with the law from those who attempt to gain competitive advantage at the expense of their workers by failing to comply with minimum labor standards.

174.   Through its conspiracy and actions as alleged herein, CRST's efforts to limit competition for and suppress compensation of their employees constituted unfair competition and unlawful and unfair business practices in violation of California Business and Professions Code § 17200 *et seq*. Specifically, CRST agreed to restrict competition for Class members' services through mutual and reciprocal non-hiring agreements, all with the purpose and effect of suppressing Class members' wages, benefits and mobility and restraining competition in the market for Class members' services. CRST's illegal conspiracy was substantially injurious to plaintiffs and the Class members.

175.   In addition, California Business and Professions Code § 16600 states, "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

176.   As recognized in *Golden v. California Emergency Physicians Medical Group* (9th Cir. 2015), California Business and Professions Code § 16600 "establishes a settled legislative policy in favor of open competition and employee mobility."

177.   California Business and Professions Code § 17200, *et seq*. prohibits acts of unfair competition which include "unlawful, unfair or fraudulent business acts. . ."

178.   As alleged herein, CRST have engaged, and continue to engage in, systemic unfair and/or unlawful business practices in violation of California Business and Professions Code §§ 16600 and 17200, *et seq.* by taking affirmative acts to prevent and restrain the employment, trade and professions of plaintiffs and the Subclass.

179.   Further, from at least four years prior to the filing of this action, through the actions and/or omissions alleged herein, CRST has engaged in unfair competition within the meaning of § 17200 of the California Business and Professions Code. These unfair business practices included knowingly using false and misleading advertising to induce plaintiffs, Student Drivers and Drivers into entering the Pre-Employment Driver Training Agreement and Driver Employment Contract, utilizing the harsh terms of the Pre-Employment Driver Training Agreement and Driver Employment Contract to trap them in their employ and/or penalize them for leaving, charging plaintiffs, Student Drivers and Drivers more than they actually paid for their trucking school and their Driver Training Program, charging plaintiffs, Student Drivers and Drivers more than they actually paid for DOT physical and drug screening tests, transportation, lodging and other administrative fees, making illegal deductions from their pay, not giving Drivers credit for the reduced rate at which they are paid, not giving drivers credit for amounts repaid through payroll deductions, seeking to collect liquidated damages based upon unenforceable and illegal clauses (Paragraph 12, subsection e., (2), of the Pre-Employment Driver Training Agreement and Paragraph 6, subsection b, of the Driver Employment Contract), and holding on their books as debt the difference between the actual cost to defendants of the trucking school, DOT physicals and drug screening tests, transportation, lodging and other administrative fees, and the unconscionable amount they sought to collect over and above this cost.

180.   CRST's acts were unfair, unlawful, and unconscionable, both in their own right and because they violated the Sherman Act, the Cartwright Act, the California

Labor Code, the California Civil Code, and California Business and Professions Code §
16600.

181.   CRST's conduct injured plaintiffs and other Class members by wages,
benefits and mobility and depriving them of free and fair competition in the market for
their services, allowing CRST to unlawfully retain money that otherwise would have
been paid to plaintiff and other Class members. Plaintiffs and other Class members are
therefore persons who have suffered injury in fact and lost money or property as a
result of the unfair competition under California Business and Professions Code
§ 17204.

182.   The harm to plaintiffs and the other Class members outweighs the utility,
if any, of defendants' policies and practices. Therefore, CRST's actions described
herein constitute an unfair business practice or act within the meaning of § 17200 of the
California Business and Professions Code.

183.   Pursuant to California Business and Professions Code § 17203, injunctive
relief is appropriate to enjoin CRST from engaging in their unfair acts and practices,
disgorgement of CRST's unlawful gains is necessary to prevent the use or employment
of CRST's unfair practices, and restitution to plaintiffs and other Class members who
resided or worked in California is necessary to restore to them the money or property
unfairly withheld from them.

184.   Wherefore, plaintiffs and the other Class members have been injured as set
forth above and request relief as hereafter provided.

**FIFTH CLAIM FOR RELIEF**

**VIOLATION OF CALIFORNIA LABOR CODE SECTION 2802**

**(On Behalf of Plaintiffs, the CRST Driver Subclass)**

Plaintiffs hereby reallege and incorporate by reference each and every allegation
set forth above as though fully set forth herein, except as said paragraphs are
inconsistent with the allegations of this cause of action.

185.   Pursuant to California Labor Code § 2802(a), "an employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful."

186.   As set forth above, CRST failed to indemnify plaintiffs and the proposed class for all necessary expenditures or losses incurred in direct consequence of the discharge of their job duties.

187.   Wherefore, plaintiffs and the other Class members have been injured as set forth above and request relief as hereafter provided.

## SIXTH CLAIM FOR RELIEF
## VIOLATION OF LABOR CODE SECTIONS 201 & 202
### On Behalf of Plaintiffs and CRST Physical and Drug Screening Test Class)

188.   Plaintiffs hereby reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein, except as said paragraphs are inconsistent with the allegations of this cause of action.

189.   California Labor Code § 201 provides that if an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately.

190.   California Labor Code § 202 requires an employer to pay an employee all earned wages within 72 hours of the employee quitting his or her employment, or immediately at the time of quitting if the employee has given 72 hours previous notice of his or her intention to quit.

191.   As set forth above, plaintiff and the other Class members were not timely paid all of their earned but unpaid wages when their employment with defendants ended.

192.   Wherefore, plaintiff and the other Class members have been injured as set forth above and request relief as hereafter provided.

### SEVENTH CLAIM FOR RELIEF

### Private Attorneys General Act

### [Cal. Lab. Code § 2698, *et seq.*]

**(On Behalf of Plaintiffs, the State of California, and Other Aggrieved Employees)**

193.   Plaintiffs hereby reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein, except as said paragraphs are inconsistent with the allegations of this cause of action.

194.   Pursuant to California Labor Code § 2699(a), any provision of the Labor Code which provides for a civil penalty to be assessed and collected by the LWDA for violations of the California Labor Code may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself and other current or former employees pursuant to the procedures outlined in California Labor Code § 2699.3.

195.   Plaintiffs were employed by CRST and the alleged violations were committed against them during their time of employment. Plaintiffs are therefore aggrieved employees as defined by California Labor Code § 2699(c). Other current and former employees are also aggrieved employees in that one or more of the alleged violations were also committed against them during their time of employment with CRST.

196.   Pursuant to California Labor Code § 2699(f), the civil penalty recoverable in a PAGA action is that which is provided for by the California Labor Code or, where no civil penalty is specifically provided, one hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and two hundred dollars ($200) for each aggrieved employee per pay period for each subsequent violation.

197.   Pursuant to California Labor Code § 2699(g), an aggrieved employee may recover the civil penalty on behalf of himself or herself and other current or former

employees against whom one or more of the alleged violations was committed. Furthermore, any employee who prevails in any such action shall be entitled to an award of reasonable attorney's fees and costs.

198. Wherefore, plaintiffs and the other aggrieved employees have been damaged as set forth above and request relief as hereafter provided.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs, on behalf of themselves and the members of the proposed Classes, requests that the Court enter an order or judgment against defendants, including the following:

As to the First through Sixth Causes of Action:

1.     Certification of the classes described herein pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.     Appointment of plaintiffs as Class Representatives and their counsel of record as Class Counsel;

3.     Threefold the amount of damages to be proven at trial;

4.     Statutory penalties pursuant to California Labor Code § 203;

5.     Restitutionary relief to plaintiffs and the members of the Class including, but not limited to, all monies which were unlawfully withheld or collected and for such orders or judgments as may be necessary to restore to the Class any monies or property which defendants have acquired by means of their unlawful or unfair business practices;

6.     Injunctive relief, including that available under California Business and Professions Code § 17203, prohibiting defendants from continuing their unlawful and unfair business practices;

7.     A permanent injunction prohibiting defendants from hereafter agreeing not to solicit other companies' employees and from including non-compete clauses in their trucker contracts;

8.      Declaratory relief, including a declaration that Paragraph 12, subsection e., (2), of the Pre-Employment Driver Training Agreement and Paragraph 6, subsection b, of the Driver Employment Contract and are illegal liquidated damages clauses in violation of California Civil Code § 1671, and that all amounts paid and debts purportedly owed pursuant thereto declared null, void and uncollectable;

9.      Declaratory relief, including a declaration that Paragraph 12, subsection e., (2), of the Pre-Employment Driver Training Agreement and Paragraph 6, subsection b, of the Driver Employment Contract procedurally and substantively unconscionable and therefore unenforceable;

10.      The costs of bringing this suit, including reasonable attorneys' fees and expenses, including those available under California Labor Code §§ 218.5 and 2802(c);

11.      Pre-judgment and post-judgment interest as provided for by law or allowed in equity; and

12.      All other relief to which plaintiffs and the Class may be entitled at law or in equity.

As to the Seventh Cause of Action:

1.      For civil penalties, including but not limited to those available under California Labor Code §§ 225.5 and 2699(f);

2.      For statutory attorneys' fees and costs, including but not limited to those available under California Labor Code § 2699(g);

3.      For prejudgment and post-judgment interest according to any applicable provision of law or as otherwise permitted by law, including those available under California Civil Code §§ 3287(a) and 3289(b), and California Labor Code § 218.6; and

For such other and further relief as the court deems just and proper.

Dated: July 26, 2018

MARC M. SELTZER
STEVEN G. SKLAVER
SUSMAN GODFREY L.L.P.

MATT R. BERRY (*pro hac vice* to be filed)
SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Seattle, WA  98101
Tel: (206) 516-3880
Fax: (206) 516-3883
mberry@susmangodfrey.com

ROBERT J. WASSERMAN
WILLIAM J. GORHAM
MAYALL HURLEY P.C.

JONATHAN MELMED (290218)
jm@melmedlaw.com
MELMED LAW GROUP P.C.
1180 South Beverly Drive, Suite 610
Los Angeles, CA 90035
Telephone: (310) 824-3828
Facsimile: (310) 862-6851

CRAIG J. ACKERMANN (SBN: 229832)
cja@ackermanntilajef.com
ACKERMANN & TILAJEF, P.C.
1180 South Beverly Drive, Suite 610
Los Angeles, CA 90035
Telephone: (310) 277-0614
Facsimile: (310) 277-0635

By: */s/ Robert J. Wasserman*
_____
Attorneys for Plaintiffs

1

**<u>JURY DEMAND</u>**

2    Pursuant to Federal Rule of Civil Procedure 38(b), plaintiffs demand a trial by

3    jury on all issues so triable.

4    Dated: July 26, 2018                MARC M. SELTZER (54534)
                                          STEVEN G. SKLAVER
5                                         SUSMAN GODFREY L.L.P.

6                                         ROBERT J. WASSERMAN
                                          WILLIAM J. GORHAM
7                                         MAYALL HURLEY P.C.

8                                         JONATHAN MELMED (290218)
                                          jm@melmedlaw.com
9                                         MELMED LAW GROUP P.C.
                                          1180 South Beverly Drive, Suite 610
10                                        Los Angeles, CA 90035
                                          Telephone: (310) 824-3828Facsimile: (310)
11                                        862-6851

12                                        CRAIG J. ACKERMANN (229832)
                                          cja@ackermanntilajef.com
13                                        ACKERMANN & TILAJEF, P.C.
                                          1180 South Beverly Drive, Suite 610
14                                        Los Angeles, CA 90035
                                          Telephone: (310) 277-0614
15                                        Facsimile: (310) 277-0635

16                                        By:  */s/ Robert J. Wasserman*
                                          _____
17                                             Attorneys for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28

46