**MCGUIREWOODS LLP**

Mathew C. Kane (SBN 171829)
mkane@mcguirewoods.com
Amy E. Beverlin (SBN 284745)
abeverlin@mcguirewoods.com
1800 Century Park East
Los Angeles, CA  90067-1501
Telephone:  310.315.8200
Facsimile:  310.315.8210

(Additional Counsel Below)

*Attorneys for Schneider National Carriers, Inc.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CURTIS MARKSON, *et al.*, | CASE NO. 5:17-cv-01261 |
| Plaintiffs, | |
| vs. | **MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE ANTITRUST CLAIMS IN THE FOURTH AMENDED COMPLAINT** |
| CRST INTERNATIONAL, INC., *et al.*, Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

CASE BACKGROUND .........................................................................................4

LEGAL STANDARD ............................................................................................5

ARGUMENT..........................................................................................................6

I.     THIS COURT'S ORDER SUSTAINING PLAINTIFFS' THIRD AMENDED COMPLAINT DOES NOT INSULATE THE FOURTH AMENDED COMPLAINT FROM REVIEW. ....................................................................................7

     A.     The Fourth Amended Complaint Must Stand on Its Own, Independently Satisfying Federal Pleading Standards. .........................................................................7

     B.     The Fourth Amended Complaint Alleges a Far Broader Conspiracy and Must Supply Additional Facts That Render it Plausible. .........................................7

     C.     In Drafting the Fourth Amended Complaint, Plaintiffs Had the Benefit of Extensive Discovery from Five Defendants and Eight Non-Parties..........................8

     D.     In Rendering Her Ruling, Judge Phillips Also Did Not Have the Benefit of a Number of Recent Decisions Directly on Point. .......................................9

II.     THE FOURTH AMENDED COMPLAINT FAILS TO ALLEGE DIRECT EVIDENCE OF A NATIONWIDE AGREEMENT. ....................................................................10

III.     THE FOURTH AMENDED COMPLAINT ALSO FAILS TO ALLEGE INDIRECT EVIDENCE OF A NATIONWIDE CONSPIRACY.....................................................11

     A.     In Critical Ways, Plaintiffs Do Not Even Allege Parallel Conduct Among All Defendants. ...........................11

     B.     Plus Factors Previously Relied Upon to Support Plaintiffs' Third Amended Complaint Are Not Suggestive of a Nationwide Conspiracy........................13

          1.     Defendants' Alleged Treatment of Under Contract Drivers Nationwide Is Not Plausibly Against Their Self Interest. ...............................13

          2.     The Communications Alleged in the Fourth Amended Complaint Are Not Suspicious in the Context of Alleged Nationwide Policies.......................15

          3.     With No Need to Conspire, Defendants Lacked

ii

Any Common Motive to Do So.........................................17

    C.    **Considered Collectively, Plaintiffs' Allegations Do Not Make a Nationwide Conspiracy Plausible.............................18**

IV.    **THE FOURTH AMENDED COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO ALLEGE A PER SE VIOLATION OR PLEAD A PRIMA FACIE CASE UNDER THE RULE OF REASON.....................................................20**

    A.    **Plaintiffs Fail to Allege a Per Se Violation of the Antitrust Laws .................................................................20**

        1.    **Per Se Analysis is Inappropriate Because The Complaint Alleges Restraints that are Primarily Vertical, With a Horizontal Element..........................21**

        2.    **The Mixed Restraints Alleged Here Must Be Analyzed Under the Rule of Reason Because They Have Procompetitive Effects...............................23**

    B.    **Plaintiffs Fail to Allege a Prima Facie Case Under the Rule of Reason...............................................................25**

V.    **PLAINTIFFS' CLAIMS FOR NATIONWIDE DAMAGES PRIOR TO APRIL 15, 2016 ARE BARRED BY THE STATUTE OF LIMITATIONS................................................26**

    A.    **The Fourth Amended Complaint Does Not Relate Back To Plaintiffs' Earlier Complaints....................................26**

        1.    **Plaintiffs' Prior Complaints Did Not Give Defendants Adequate Notice of the Claims of the Newly Proposed Class Members....................27**

        2.    **There Is Not an Identity of Interests Between Plaintiffs and the Newly Proposed Class Members, and Relation Back Would Unfairly Prejudice Defendants. .......................................27**

    B.    **Plaintiffs' Cursory Allegations of Fraudulent Concealment Are Insufficient To Toll The Statutes of Limitations...................................................................28**

**CONCLUSION ........................................................................30**

MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE ANTITRUST CLAIMS IN THE FOURTH AMENDED COMPLAINT

**TABLE OF AUTHORITIES**

Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).........................................................................5

*Avila v. I.N.S.,* 731 F.2d 616 (9th Cir. 1984)................................................................27

*Aya Healthcare Services, Inc. v. AMN Healthcare, Inc.*, No. 17-205, 2018 WL 3032552 (S.D. Cal. June 19, 2018) ...............................................................................19

*Aydin Corp. v. Loral Corp.*, 718 F.2d 897 (9th Cir. 1983) .........................................22

*B & R Supermarket, Inc. v. Visa, Inc.*, No. 16-01150, 2016 WL 5725010 (N.D. Cal. Sept. 30, 2016)...............................................................................................................17

*Bell Atl. Corp. v. Twombly*, 550 U.S. 555 (2007).........................................5, 6, 8, 18

*Beneficial Standard Life Ins. Co. v. Madariaga,* 851 F.2d 271 (9th Cir. 1988) .......30

*Besig v. Dolphin Boating & Swimming Club*, 683 F.2d 1271 (9th Cir. 1982)..........28

*Bona Fide Conglomerate, Inc. v. SourceAmerica*, 691 F. App'x 38 (9th Cir. 2017)13

*Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272 (7th Cir. 1983) ...............................................................................................................................22

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717 (1988) .................................20

*C.R. England, Inc. v. Swift Transp. Co.*, No. 14-781, 2019 WL 5213098, (D. Utah Oct. 16, 2019)...................................................................................................................2

*Cal. Dental Ass'n v. FTC*, 526 U.S. 756 (1999)..........................................................23

*California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118 (9th Cir. 2011) ...............20

*Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113 (11th Cir. 2004) ....................27

*Cochran Firm, P.C. v. Randy H. McMurray, P.C.*, No. 12-5868, 2015 WL 12661951 (C.D. Cal. July 16, 2015) ..............................................................................7

*Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499 (9th Cir. 1988)............29

*County of Tuolumne v. Sonora Comty. Hosp.*, 236 F.3d 1148 (9th Cir. 2001).........20

*CRST Expedited, Inc. v. J.B. Hunt Transp., Inc.*, No. 17-26, 2018 WL 1369918 (N.D. Iowa Mar. 15, 2018)...............................................................................................2

*CRST Expedited, Inc. v. Swift Transp. Co. of Ariz., LLC*, No. 17-0025 (N.D. Iowa July 23, 2019) ..............................................................................................................1, 9

*CRST Expedited, Inc. v. TransAm Trucking, Inc.*, --- F.3d ---, No. 18-2633, 2020 WL 2745547 (8th Cir. May 27, 2020) .......................................................................2, 9

iv

*CRST Van Expedited, Inc. v. J.B. Hunt Transp., Inc.*, No. 04-651, 2006 WL 335765
(W.D. Okla. Feb. 14, 2006) ...................................................................... 2, 24

*CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*, No. 04-04676 (C.D. Cal. July
23, 2007) ................................................................................................... 2

*CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099 (9th Cir. 2007) ... 2

*Frost v. LG Elecs., Inc.*, 801 F. App'x 496 (9th Cir. 2020) .............................. 3, 6, 10

*Frost v. LG Elecs., Inc.*, No. 16-05206, 2018 WL 6256790 (N.D. Cal. July 9, 2018)
.................................................................................................................. 10, 20

*Green v. Racing Ass'n of Cent. Iowa*, 713 N.W.2d 234 (Iowa 2006) ...................... 16

*Hanger v. Berkley Group, Inc.*, No. 13-113, 2015 WL 3439255 (W.D. Va. May 28,
2015) ....................................................................................................... 23

*Hexcel Corp. v. Ineos Polymers, Inc.,* 681 F.3d 1055 (9th Cir. 2012) ..................... 28

*Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018) ........................................ 25

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) ..... 25

*In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195 (N.D. Cal. 2015) ... 29,
30

*In re Animation Workers Antitrust Litigation*, 123 F. Supp. 3d 1175 (N.D. Cal.
2015) ....................................................................................................... 19

*In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003 (N.D. Cal. 2008) .................. 21

*In re Citric Acid Litig.*, 191 F.3d 1090 (9th Cir. 1999) ........................................ 10

*In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, 328 F. Supp.
3d 217 (S.D.N.Y. 2018) ........................................................................... 17

*In re German Auto. Mfrs. Antitrust Litig.*, MDL No. 2796, 2020 WL 1542373 (N.D.
Cal. Mar. 31, 2020) ........................................................................... 21, 25

*In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103 (N.D. Cal. 2012)
.................................................................................................................. 19, 20

*In re Ins. Brokerage Antitrust Litig.*, No. 04-5184, 2007 WL 2533989 (D.N.J. Aug.
31, 2007) ................................................................................................... 8

*In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186 (9th Cir. 2015) 6,
11, 13

*In re Packaged Seafood Prods. Antitrust Litig.*, No. 15-2670, 2017 WL 35571 (S.D.
Cal. Jan. 3, 2017) ..................................................................................... 30

*In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, 903 F. Supp. 2d 880
(C.D. Cal. 2012) ....................................................................................... 7

MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS
THE ANTITRUST CLAIMS IN THE FOURTH AMENDED COMPLAINT

*In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, MDL No. 09-2074, 2013 WL 12130034 (C.D. Cal. July 19, 2013) ........................................................ 7

*J.B. Hunt Transp., Inc. v. Stevens Transp., Inc.*, No. 05-5164, 2006 WL 1707184 (W.D. Ark. June 19, 2006) ................................................................................ 2

*Jain Irrigation, Inc. v. Netafim Irrigation, Inc.*, 386 F. Supp. 3d 1308 (E.D. Cal. 2019) ................................................................................................................ 21, 25

*Kendall v. VISA U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008) .......................... 6, 8, 18

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) .............. 20

*Llacua v. W. Range Ass'n*, 930 F.3d 1161 (10th Cir. 2019) ................................... 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ........... 6, 13

*N. Pac. Ry. v. United States*, 356 U.S. 1 (1958) ................................................ 22, 23

*National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978) .................. 22

*Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038 (9th Cir. 2008) ............ 25

*Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145 (9th Cir. 2003) ......... 20, 23

*Raynor Bros. v. Am. Cyanimid Co.*, 695 F.2d 382 (9th Cir. 1982) .................... 27, 28

*Rosenbaum v. Syntex Corp. (In re Syntex Corp. Sec. Litig.)*, 95 F.3d 922 (9th Cir. 1996)………..27

*Rutledge v. Boston Woven Hose & Rubber Co.,* 576 F.2d 248 (9th Cir. 1978) ........ 30

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, No. 09-00560, 2013 WL 595122 (E.D. Cal. Feb. 15, 2013) ..................................................................... 16

*Surf City Steel, Inc. v. Int'l Longshore & Warehouse Union*, No. 14-05604, 2017 WL 5973279 (C.D. Cal. Mar. 7, 2017) ............................................................ 21

*Tanaka v. Univ. S. Cal.*, 252 F.3d 1059 (9th Cir. 2001) ........................................ 25

*United States v. Joyce*, 895 F.3d 673 (9th Cir. 2018) ............................................ 20

*United States v. Topco Assocs. Inc.*, 405 U.S. 596 (1972) ..................................... 22

*Williams v. 5300 Columbia Pike Corp.*, 891 F. Supp. 1169 (E.D. Va. 1995) .......... 13

*Willner v. Manpower, Inc.*, No. 11-2846, 2014 WL 2939732 (N.D. Cal. June 30, 2014) ............................................................................................................ 27

*Zinman v. Wal-Mart Stores, Inc.,* No. 09-02045, 2010 WL 2230449 (N.D. Cal. June 1, 2010) ........................................................................................................ 27

Statutes

15 U.S.C. § 1 ...................................................................................................... 5

MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS
THE ANTITRUST CLAIMS IN THE FOURTH AMENDED COMPLAINT

15 U.S.C. § 15b ................................................................................................ 26

49 C.F.R. § 391.23(a) ...................................................................................... 16

Cal. Bus. & Prof. Code § 16750.1 ................................................................. 26

Cal. Bus. & Prof. Code §§ 16700. .................................................................. 5

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
   Principles and Their Application* (4th ed. 2013-2018) ............................ 21, 24

Restatement (Third) of Torts (2019) ................................................................ 1

MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS
THE ANTITRUST CLAIMS IN THE FOURTH AMENDED COMPLAINT

## INTRODUCTION

Plaintiffs' theory of relief has long since overreached their limited factual allegations.  What began in 2017 as a state-law wage and hour suit against a single company, CRST, has steadily expanded ever since.  After first adding four new Defendants and alleging a "no poach" conspiracy affecting California truck drivers, Plaintiffs have now added three more Defendants and expanded the scope of their alleged conspiracy to cover the entire nation.  This latest expansion pushes Plaintiffs' theory beyond its breaking point and confirms that their antitrust claims are implausible.  Indeed, the limited facts Plaintiffs allege—largely unchanged since their last pleading—simply do not establish a nationwide conspiracy as Plaintiffs erroneously claim.  The antitrust claims should be dismissed in their entirety.

Plaintiffs' central allegation in the Fourth Amended Complaint is that the Defendants, eight trucking companies, declined to hire applicant drivers who were "under contract"—*i.e.,* subject to a non-compete with another motor carrier.  Such an unremarkable premise invites an equally unremarkable explanation: that Defendants each declined to hire "under contract" drivers precisely *because* they were "under contract."  A robust body of tort law prohibits interference with a valid contract for one's own economic benefit.  *See* Restatement (Third) of Torts § 17 (2019).  And courts across the country have applied it in this very context.  A motor carrier cannot interfere with another carrier's driver contracts, those courts have made clear, without potentially exposing itself to significant liability.  Simply put, *that* is why each of the Defendants independently decided not to hire each other's "under contract" drivers.  Plaintiffs' allegations to the contrary are implausible.

Just last year, for instance, a jury returned a verdict of more than $15 million (later reduced) in favor of CRST on its claim that Swift intentionally interfered with CRST contracts when it actively recruited drivers still under a valid non-compete with CRST.  *See* Judgment, *CRST Expedited, Inc. v. Swift Transp. Co. of Ariz., LLC*, No. 17-0025 (N.D. Iowa July 23, 2019) (D.E. 238) (Request for Judicial Notice ("RJN"),

1

Ex. 1).  And while its yield in that instance may be noteworthy, this legal theory is no outlier.  Last month, the Eighth Circuit reversed a grant of summary judgment against CRST, finding sufficient evidence to support its claim "alleging TransAm wrongfully recruited and hired several long-haul truck drivers who were under contract with CRST."  *CRST Expedited, Inc. v. TransAm Trucking, Inc.*, --- F.3d ---, No. 18-2633, 2020 WL 2745547, at *1 (8th Cir. May 27, 2020).  And in *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1105 (9th Cir. 2007), the Ninth Circuit reversed the dismissal of similar claims against Werner, holding "CRST adequately alleged each of these five elements required for intentional interference with contract."  This Court subsequently approved as "proper and lawful" the settlement of that claim, in which Werner agreed not to hire CRST's "under contract" drivers.  *CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*, No. 04-04676 (C.D. Cal. July 23, 2007) (D.E. 61) (Real, J.) (RJN, Ex. 2).

In short, motor carriers routinely sue one another (or threaten to) for hiring away "under contract" drivers—not always with success, but often enough to reasonably counsel caution or else risk years of expensive litigation.  *See, e.g., C.R. England, Inc. v. Swift Transp. Co.*, No. 14-781, 2019 WL 5213098, at *3 (D. Utah Oct. 16, 2019) (granting C.R. England's motion for voluntary dismissal after Utah Supreme Court answered certified question on elements of intentional interference); *J.B. Hunt Transp., Inc. v. Stevens Transp., Inc.*, No. 05-5164, 2006 WL 1707184, at *1-3 (W.D. Ark. June 19, 2006) (denying J.B. Hunt's bid for a declaratory judgment that it did not interfere with Stevens' contracts); *CRST Van Expedited, Inc. v. J.B. Hunt Transp., Inc.*, No. 04-651, 2006 WL 335765 (W.D. Okla. Feb. 14, 2006) (enjoining J. B. Hunt from tortiously interfering with CRST's contracts with its drivers); *CRST Expedited, Inc. v. J.B. Hunt Transp., Inc.*, No. 17-26, 2018 WL 1369918 (N.D. Iowa Mar. 15, 2018) (denying J.B. Hunt's motion to dismiss CRST's claim for intentional interference with contract).  Considered against this backdrop, Defendants' alleged refusal to hire "under contract" drivers—particularly those of

MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS
THE ANTITRUST CLAIMS IN THE FOURTH AMENDED COMPLAINT

frequent litigants—is glaringly obvious rational and unilateral behavior that is beyond the reach of § 1 of the Sherman Act.

Yet Plaintiffs eschew this straightforward and logical explanation. They insist instead that Defendants' actions are not the result of independent efforts to minimize legal risk, but rather the coordinated outcome of a vast nationwide conspiracy among eight motor carriers to restrict driver mobility and depress first-year wages in the trucking industry. To withstand dismissal, Plaintiffs must offer *something* that suggests their sweeping conspiracy theory is the more plausible explanation. The Fourth Amended Complaint offers nothing remotely close. Instead, its bid for nationwide relief is propped up only by Plaintiffs' own say-so.

Plaintiffs have not always been so ambitious. For months, they looked only to exploit a purportedly unique aspect of California law to seek relief for California drivers. According to Plaintiffs, the non-compete provisions at issue were not enforceable under California law, and so the purported desire to avoid liability for interfering with California contracts *must* have been "pretext" for a conspiracy. Plaintiffs advanced this more limited theory in support of their Third Amended Complaint.[1]

With their Fourth Amended Complaint, Plaintiffs now insist that the conspiracy was nationwide, spanning dozens of jurisdictions in which non-competes are indisputably enforceable and regularly enforced. Against this much wider backdrop, Plaintiffs' "pretext" argument—which was wrong even as to California—vanishes. Yet rather than bolster their new pleading with additional facts that actually suggest a broader conspiracy, they rely on virtually identical allegations made by the same four

---

[1] Plaintiffs' characterization of California law is wrong, as are the conclusions they previously attempted to draw. Moreover, while Judge Phillips held the Third Amended Complaint plausibly pled a claim under § 1, Defendants respectfully maintain that her decision is inconsistent with other § 1 cases—including, but not limited to, a recent decision from the Ninth Circuit affirming the dismissal by the Northern District of California of a § 1 complaint alleging this same sort of "no poach" agreement. *See Frost v. LG Elecs., Inc.*, 801 F. App'x 496, 497 (9th Cir. 2020).

California-based plaintiffs.  Indeed, aside from a handful of allegations about the three newly named Defendants, Plaintiffs have offered no new facts of any kind, despite conducting discovery for more than a year and obtaining hundreds of thousands of documents from Defendants and third parties.

Plaintiffs' failure to supplement their allegations is fatal to their claim for nationwide relief.  Supposedly unique features of California law may have been enough—in Judge Phillips' view at the time—to nudge a California conspiracy across the line from possible to plausible.  Without any additional support, the same simply cannot be true of the sprawling, nationwide conspiracy Plaintiffs now allege.

## CASE BACKGROUND

Plaintiffs are four individuals who previously worked as truck drivers for one of the Defendants, all of whom are separate motor carriers.  *See* 4AC ¶¶ 65-76, 112-122.  Suing on behalf of a putative nationwide class, Plaintiffs allege harm resulting from a scheme among the eight Defendants not to hire drivers who were "under contract" with another motor carrier.  *See* 4AC ¶ 58.  This scheme, Plaintiffs allege, limited "the hiring and lateral mobility" of drivers and "allowed employers to keep wages and salaries down." 4AC ¶¶ 8, 30.

According to Plaintiffs, an "under contract" driver is one "who attended one of defendants' driver training schools or [was] offered reimbursement for their driver training courses," and then agreed to remain with that carrier for a certain period in exchange for tuition forgiveness.  4AC ¶ 2.  Defendants' employment contracts, Plaintiffs allege, included non-compete provisions covering the period during which tuition was still owed.  4AC ¶ 3.  Defendants refused to hire drivers contractually obligated to another motor carrier in this way, Plaintiffs further allege, making inquiries to determine whether an applicant was "under contract" before hiring.  4AC ¶¶ 58, 62.  And upon learning that an "under contract" driver had applied to another carrier, Plaintiffs continue, certain Defendants sent cease-and-desist letters to that carrier, threatening legal action for interference with its contracts.  4AC ¶¶ 8, 78.

4

According to Plaintiffs, these actions were not the result of unilateral business decisions by companies to avoid tortious interference and otherwise comply with the law, but rather an illicit, nationwide "no poach" conspiracy.  *See* 4AC ¶ 7, 58-64.  Plaintiffs seek relief under § 1 of the Sherman Act, 15 U.S.C. § 1, and California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq*.  *See* 4AC ¶¶ 165-175.

This is Plaintiffs' fifth complaint in this action, and the second to advance claims under the antitrust laws.  Plaintiffs' Third Amended Complaint, filed prior to any discovery on Plaintiffs' "no poach" claims, alleged that five of the eight motor carriers now named as Defendants conspired on a substantially similar scheme with respect to California drivers only.  *See generally* Third Am. Compl. (D.E. 55) ("3AC").  In an Order dated March 7, 2019, Judge Phillips denied Defendants' motion to dismiss the antitrust claims in the Third Amended Complaint, finding Plaintiffs' California conspiracy sufficiently pled.  *See* Order (D.E. 130).

Plaintiffs sought leave to file the Fourth Amended Complaint on February 14, 2020, which this Court granted on April 14, 2020.  *See* D.E. 213, 226.  Plaintiffs assert that they "learned more about the scope of the wrongful conduct of the conspiracy while reviewing documents" produced in discovery.  Pls.' Mot. to Amend at 1 (D.E. 213-1).  Those documents, which Plaintiffs "received from Defendants and third parties," purportedly demonstrated that the alleged "conspiracy is nationwide."  *Id.*

## LEGAL STANDARD

A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted), and should be dismissed if the factual allegations fail to "nudge[] [plaintiffs'] claims across the line from conceivable to plausible," *Bell Atl. Corp. v. Twombly*, 550 U.S. 555, 570 (2007).

Like the plaintiffs in *Twombly*, Plaintiffs seek relief under § 1 of the Sherman Act, which prohibits any "contract, combination . . . , or conspiracy[] in restraint of trade."  15 U.S.C. § 1.  Because this provision prohibits "only restraints effected by a

contract, combination, or conspiracy," the Supreme Court has held, "'[t]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an *agreement*.'" *Twombly*, 550 U.S. at 553 (alterations in original) (emphasis added) (citation omitted).  To withstand dismissal then, a § 1 plaintiff must plead facts sufficient to establish a collusive agreement.  There are two ways to do so—through "direct evidence" of the agreement itself, or through a combination of parallel conduct and "plus factors," *i.e.,* "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015).

The Ninth Circuit has also recently held that "to state a claim for antitrust conspiracy, plaintiffs must allege 'who, did what, to whom (or with whom), where, and when?'" *Frost v. LG Elecs., Inc.*, 801 F. App'x 496, 497 (9th Cir. 2020).  The requirement to answer certain "basic questions," "such as a 'specific time, place, or person involved in the alleged conspirac[y],'" ensures that "defendant[s] seeking to respond" are afforded "an idea of where to begin." *Kendall v. VISA U.S.A., Inc.*, 518 F.3d 1042, 1047-48 (9th Cir. 2008) (quoting *Twombly*, 550 U.S. at 565 n.10)).  Consistent with § 1's prohibition on *concerted* action, the facts alleged must "tend[] to exclude the possibility . . . of independent action." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

## ARGUMENT

The antitrust claims in the Fourth Amended Complaint should be dismissed because they fail to satisfy well-established federal pleading standards.  Plaintiffs allege no facts that plausibly establish a nationwide agreement among the Defendants not to hire one another's "under contract" drivers.  At the very least, this Court should hold that Plaintiffs have failed to state a *per se* violation of the Sherman Act, and that Plaintiffs' § 1 claim should instead be evaluated under the "rule of reason."  Finally, Plaintiffs' claim for damages covering the period prior to April 15, 2016 are barred

1   by the Sherman Act's four-year statute of limitations.

2   **I.   THIS COURT'S ORDER SUSTAINING PLAINTIFFS' THIRD
3        AMENDED COMPLAINT DOES NOT INSULATE THE FOURTH
        AMENDED COMPLAINT FROM REVIEW.**

4        Plaintiffs' Fourth Amended Complaint is now the operative pleading in this

5   case.  As such, it is the Fourth Amended Complaint that must state a plausible claim

6   for the relief it seeks.  This is an entirely new question that warrants fresh—and

7   indeed, *more* searching—scrutiny here.

8        **A.   The Fourth Amended Complaint Must Stand on Its Own,
             Independently Satisfying Federal Pleading Standards.**

9
        The Third Amended Complaint is now a nullity, and the Court's prior Order
10
    sustaining it is not dispositive of this Motion.  As this Court has noted, "the law is
11
    clear in this Circuit that an 'amended complaint supersedes the original, the latter
12
    being treated thereafter as nonexistent.'"  *In re WellPoint, Inc. Out-of-Network*
13
    *"UCR" Rates Litig.*, MDL No. 09-2074, 2013 WL 12130034, at *2 (C.D. Cal. July
14
    19, 2013) (citation omitted).  For this reason, "[c]ourts in this Circuit . . . have
15
    permitted defendants moving to dismiss an amended complaint to make arguments
16
    previously made and to raise new arguments that were previously available."  *Id.*[2]
17
    Defendants' challenge to the sufficiency of Plaintiffs' Fourth Amended Complaint
18
    must therefore be evaluated from a clean slate.
19
        **B.   The Fourth Amended Complaint Alleges a Far Broader Conspiracy
20           and Must Supply Additional Facts That Render it Plausible.**

21       Judge Phillips' prior Order would be of limited relevance in any event, as the

22   Fourth Amended Complaint alleges a far broader conspiracy than Plaintiffs' previous

23   pleading.  The "factual matter" necessary to plausibly allege a California conspiracy

24

25   _____

26   [2]  A court's "rulings on [a] previous motions to dismiss are not dispositive of"
     subsequent motion[] attacking the sufficiency of amended pleadings.  *Cochran Firm,*
     *P.C. v. Randy H. McMurray, P.C.*, No. 12-5868, 2015 WL 12661951, at *4 (C.D. Cal.
27   July 16, 2015).  An "amended pleading is a new round of pleadings," in other words,
     and "is subject to the same challenges as the original."  *In re WellPoint, Inc. Out-of-*
28   *Network "UCR" Rates Litig.*, 903 F. Supp. 2d 880, 893-94 (C.D. Cal. 2012).

_____

MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS
THE ANTITRUST CLAIMS IN THE FOURTH AMENDED COMPLAINT

among five carriers is different than that required to allege a nationwide conspiracy among eight carriers—with the latter demanding much more.  *Twombly*, 550 U.S. at 556.  Indeed, it is Plaintiffs' supposed discovery of new factual matter that apparently prompted them to amend in the first place.  *See* Pls.' Mot. to Amend at 1 (D.E. 213-1).  The question now is whether any new factual matter actually pled is sufficient to support the expanded conspiracy Plaintiffs now allege.

**C.    In Drafting the Fourth Amended Complaint, Plaintiffs Had the Benefit of Extensive Discovery from Five Defendants and Eight Non-Parties.**

Changed circumstances also mandate a particularly rigorous analysis of the Fourth Amended Complaint's allegations because Plaintiffs took substantial discovery on the merits of their antitrust claim prior to filing.  Courts have proven especially reticent to sustain borderline pleadings filed after discovery has taken place.  In *Kendall*, for instance, the Ninth Circuit affirmed the dismissal of a § 1 claim where the plaintiffs "used the facts learned in [party] depositions to form the allegations in their First Amended Complaint" and yet still failed to "answer . . . basic questions" about the supposed agreement.  518 F.3d at 1046, 1048; *see also id.* at 1051-52 (explaining that plaintiffs "were given an opportunity to conduct discovery to discover the facts needed to plead their causes of action"); *In re Ins. Brokerage Antitrust Litig.*, No. 04-5184, 2007 WL 2533989, at *18-19 (D.N.J. Aug. 31, 2007), *aff'd in part*, 618 F.3d 300 (3d Cir. 2010) (dismissing antitrust conspiracy claims where plaintiffs had "engaged in a plethora of discovery to date").

Plaintiffs have little room to quarrel with this standard.  Indeed, they actually *distinguished* the *Kendall* decision on this basis when defending their Third Amended Complaint.  *See* Pls.' Opp'n to Prior MTD at 11 (D.E. 121) (arguing that "*Kendall* is . . . distinguishable" because "the plaintiffs in *Kendall* were afforded the opportunity to obtain discovery in support of their conspiracy claims" while "Plaintiffs have not conducted discovery on the newly-added antitrust claims in this matter").  This is no longer true.  Plaintiffs have taken a huge amount of discovery to date—not only from

8

the five defendants to the Third Amended Complaint, but from *eight* non-parties as well. *See* Defs.' Opp'n to Mot. to Amend at 9-11 (D.E. 215) (describing the hundreds of thousands of documents produced collectively by Defendants). In plain terms, that should be enough to fashion a plausible claim for relief—were one to exist at all.

Plaintiffs have further characterized the discovery they received as both comprehensive and relevant to their expanded claim. *See* Pls.' Mot. to Amend at 10 (D.E. 213-1) (noting that discovery prior to the Fourth Amended Complaint covered "documents referring to drivers at the national level"); Reply in Support of Pls.' Mot. to Amend (D.E. 216) at 1 (noting the production of the "the vast majority documents demonstrating the nationwide conspiracy – all of which *were* in Defendants' possession" (emphasis added)); *id.* at 2 ("Plaintiffs did not have the evidence of the nationwide conspiracy *until Defendants produced the relevant documents*." (emphasis added)). Plaintiffs can no longer hide behind their supposed inability to access information about the alleged conspiracy.

### D.   In Rendering Her Ruling, Judge Phillips Also Did Not Have the Benefit of a Number of Recent Decisions Directly on Point.

Finally, the relevant legal landscape has changed as well. Since Judge Phillips issued her Order on the Third Amended Complaint, a number of rulings have issued that bear directly on the sufficiency of Plaintiffs' claims for antitrust relief. Specifically, CRST obtained its $15+ million tortious interference verdict against Swift Transportation in the interim, and the Eighth Circuit ruled in CRST's favor on a similar claim last week. *See supra* pp. 1-2 (citing Judgment, *CRST Expedited, Inc. v. Swift Transp. Co. of Ariz., LLC*, No. 17-0025 (N.D. Iowa July 23, 2019) (D.E. 238) (RJN, Ex. 1); *CRST Expedited, Inc. v. TransAm Trucking, Inc.*, No. 18-2633, 2020 WL 2745547, at *1 (8th Cir. May 27, 2020)). Each of these developments even further undercuts Plaintiffs' claim that *only a conspiracy* could plausibly explain Defendants' decisions not to hire "under contract" drivers. Furthermore, the Ninth Circuit recently supplied new guidance concerning the evaluation of "no poach"

conspiracies at the pleading stage, affirming the district court's dismissal of a complaint alleging "a global conspiracy not to poach each other's employees in violation of Section 1 of the Sherman Act." *Frost*, 801 F. App'x at 497. These decisions—unavailable to Judge Phillips—must now inform this Court's analysis.

## II.   THE FOURTH AMENDED COMPLAINT FAILS TO ALLEGE DIRECT EVIDENCE OF A NATIONWIDE AGREEMENT.

Plaintiffs' Fourth Amended Complaint alleges no direct evidence of a nationwide conspiracy among the Defendants. "To meet the direct evidence standard" at the pleading stage, a plaintiff's allegations "must explicitly support the asserted proposition without requiring any inference." *Frost*, 801 F. App'x at 497 (citing *In re Citric Acid Litig.*, 191 F.3d 1090, 1093-94 (9th Cir. 1999)). Direct evidence, in other words, is a "smoking gun"—behavior that simply cannot "be construed in a benign light." *In re Citric Acid*, 191 F.3d 1090, 1104 (9th Cir. 1999).

This is a demanding standard—and no less so in the no-poach context. In fact, the recent *Frost* decision reveals just how demanding. In that case, the Ninth Circuit affirmed the Northern District of California's dismissal of a complaint similarly alleging a vast conspiracy among competitors not to hire one another's employees. *Frost*, 801 F. App'x at 497. At issue there were allegations that the plaintiffs had been *expressly told* of a "gentleman's agreement" to that precise effect, an arrangement that supposedly "'trickle[d] down' to the respective United States subsidiaries." *Frost v. LG Elecs., Inc.*, No. 16-05206, 2018 WL 6256790, at *3 (N.D. Cal. July 9, 2018), *aff'd*, 801 F. App'x 496 (9th Cir. 2020). Because "some of this evidence requires the Court to draw significant inferences to establish the existence of the alleged agreement between the Korean parent companies," the Northern District held, it did "not constitute 'direct' evidence." *Id.* at *4. The Ninth Circuit agreed, noting that plaintiffs' allegations merely recounted "various statements made by defendants' employees and by a recruiter affiliated with" one of them. *Frost*, 801 F. App'x at 498. Because "each of these statements requires inferences in order to support the

existence of a conspiracy," they did not constitute "direct evidence of agreement." *Id.*

Against this backdrop, the Fourth Amended Complaint falls well shy of pleading direct evidence of a nationwide conspiracy. Much like the *Frost* plaintiffs, Plaintiffs here allege several statements made by employees of Defendants. *See, e.g.*, 4AC ¶ 67 ("Western Express refused to hire McClendon because he was 'under contract with CRST,' and Western Express could not 'bring you in until you are released from that contract.'"); 4AC ¶ 71 ("C.R. England sent the following message to McClendon: . . . 'CRST is reporting that you are still under contract. I will not be able to hire you till your contract has been satisfied.'"); 4AC ¶¶ 77-79 (alleging that certain defendants sent cease-and-desist letters warning competitors not to interfere with prospective drivers' existing contracts). But these statements require even more inference to support a conspiracy than those at issue in *Frost*. Not one of those statements on its face even *hints* at the existence of an *agreement* between the Defendants—let alone one encompassing all fifty states. Indeed, quite the opposite— each statement expressly conveys a *non-conspiratorial* reason for the refusal to hire. To be sure, Plaintiffs insist that this reason is mere pretext, but that is *precisely* the sort of inferential leap that direct evidence of an agreement does not allow.

## III.  THE FOURTH AMENDED COMPLAINT ALSO FAILS TO ALLEGE INDIRECT EVIDENCE OF A NATIONWIDE CONSPIRACY.

Having failed to supply direct evidence, Plaintiffs must instead rely on indirect, or "circumstantial" evidence to establish their purported nationwide conspiracy. *See Musical Instruments*, 798 F.3d at 1193. Absent direct evidence, a § 1 plaintiff may still plausibly state a claim by alleging both "parallel conduct" and "plus factors." *Id.* at 493-94. Plaintiffs supply neither, alleging actions "no more consistent with an illegal agreement than with rational and competitive business strategies." *Id.* at 1189.

### A.  In Critical Ways, Plaintiffs Do Not Even Allege Parallel Conduct Among All Defendants.

First, Defendants' alleged conduct is not sufficiently parallel to support the inference of a nationwide conspiracy. Plaintiffs allege only that each of the

11

Defendants declined "to hire employees who remain 'under contract' with another trucking company."  4AC ¶ 2.  Beyond this unremarkable premise, Defendants' alleged conduct varies in important ways.  And while evident on the face of prior pleadings as well, the addition of three new Defendants in the operative complaint introduces even more variance into the supposedly common scheme they allege.

To begin with, Plaintiffs concede that Defendants' various employment contracts do not even treat drivers equally.  CRST, for example, requires drivers to remain employed for "10 months" in order "to 'pay back' their trucking school tuition."  4AC ¶ 60.  For C.R. England, on the other hand, this period is only "9 months."  4AC ¶ 60.  Plaintiffs suggest that Paschall used similar "contractual non-compete agreement[s]," but remain silent as to their duration.  4AC ¶ 78.  Even more critically, Plaintiffs include *no* allegations regarding any such provisions in use by the remaining Defendants—a fact rendered all the more significant by the substantial document discovery that Plaintiffs have already taken.  And Plaintiffs' *other* allegations even suggest that certain Defendants may not have used non-compete provisions at all.  *See* 4AC ¶ 8 (alleging that only five of the eight Defendants sent cease-and-desist letters warning other motor carriers about their non-competes).

This is no mere nit-picking.  At its core, Plaintiffs' allegation is that Defendants conspired to honor one another's non-compete provisions by agreeing not to hire drivers already "under contract" with another carrier.  *See* 4AC ¶¶ 3-4.  If that were true (and it is not), then Plaintiffs have alleged a badly lopsided conspiracy.  By Plaintiffs' logic, the "no poach" period would be 10 months for CRST drivers, only 9 months for C.R. England drivers, some unknown period for Paschall drivers, and potentially even *no time* for certain other Defendants.  Plaintiffs contend, in other words, that Defendants reached an illegal agreement—each risking joint-and-several liability—but bargained for demonstrably different benefits, *if any benefits at all*.

Not only is this not parallel conduct, it simply makes no sense.  Where a "plaintiff . . . alleges" such an "irrational or economically implausible antitrust

12

1    conspiracy," courts have required that he or she also "come forward with particularly

2    persuasive evidence of a conspiracy." *Williams v. 5300 Columbia Pike Corp.*, 891 F.

3    Supp. 1169, 1175 n.9 (E.D. Va. 1995) (citation omitted). *Cf. Matsushita*, 475 U.S. at

4    587. Plaintiffs supply no such persuasive evidence here.

5          **B.    Plus Factors Previously Relied Upon to Support Plaintiffs' Third
           Amended Complaint Are Not Suggestive of a Nationwide
6          Conspiracy.**

7          To begin with, this Court need not even consider whether the Fourth Amended

8    Complaint alleges sufficient plus factors.  *See Bona Fide Conglomerate, Inc. v.*

9    *SourceAmerica*, 691 F. App'x 389, 391 (9th Cir. 2017) ("'Plus factors' are relevant

10   only if the complaint adequately alleges parallel conduct among the defendants.")

11   (citing *Musical Instruments*, 798 F.3d at 1193–94).  Were the Court to do so, however,

12   the plus factors previously relied upon by Plaintiffs to defend their Third Amended

13   Complaint are of no use now, as they fail to support the much broader conspiracy

14   being alleged.   As the Ninth Circuit has explained, "plus factors" are "economic

15   actions and outcomes that are largely inconsistent with unilateral conduct but largely

16   consistent with explicitly coordinated action." *Musical Instruments,* 798 F.3d at 1194.

17   Yet when evaluated as applicable "nationwide," Defendants' alleged actions *only*

18   make plausible sense as unilateral conduct.

19              *1.    Defendants' Alleged Treatment of Under Contract Drivers
                    Nationwide Is Not Plausibly Against Their Self Interest.*
20
21         With respect to their prior complaint, Plaintiffs argued principally that any

22   decision not to hire an "under contract" driver was "probative of a prior agreement"

23   because it ran counter to each Defendant's "independent incentives" to hire drivers

24   who already had their CDLs.  Pls.' Opp'n to Prior MTD at 15-16 (D.E. 121); *see also*

25   *Musical Instruments*, 798 F.3d at 1195 (noting that "extreme action against self-

26   interest . . . may suggest prior agreement").  Yet Plaintiffs' explanation for why this

27   was so hinged on their position that Defendants' "non-compete agreements with

28   drivers are unlawful under California law."  Pls.' Opp'n to Prior MTD at 18 (D.E.

13

121).  The decision not to hire "under contract" drivers in California, Plaintiffs argued, *must* be "pretext to protect Defendants' conspiracy" because the contractual provisions at issue were not enforceable in any event.  *See id.* at 17-18.  As Plaintiffs put it in their opposition brief: "Absent a conspiracy, sophisticated competitors, who are frequently parties to complex litigation, would not uniformly misinterpret [California] law against their own self-interest."  *Id.* at 18.[3]  Defendants' failure to poach *California* drivers, in other words, was supposedly indicative of an agreement as to drivers in that state.

This argument is entirely unpersuasive now that Plaintiffs contend that "the conspiracy is nationwide."  Pls.' Mot. to Amend at 1 (D.E. 213-1).  Plaintiffs can no longer plausibly suggest that Defendants act against their self-interest when they decline to hire "under contract" drivers across the *dozens* of jurisdictions in which the non-compete provisions at issue are unquestionably enforceable.  Rather, the most plausible—and the simplest—explanation requires no inference at all, for it is reflected in Defendants' communications quoted in the complaint itself:  "[Being 'under contract'] means by law we can't hire you until you're released from the contract or we could be sued…" 4AC, ¶ 68.[4]  Defendants decline to hire "under contract" drivers, in other words, to mitigate their risk of legal liability.  Again, this risk is far from theoretical.  As set forth above, motor carriers across the country have *in fact been found liable* for hiring such drivers, and ordered to pay millions of dollars in damages.  *See supra* pp. 1-2.  Plaintiffs now argue that it is not the avoidance of litigation that is motivating Defendants to steer clear of "under contract" drivers, but

---

[3] Plaintiffs reiterated this point during oral argument, asserting that "the covenants not to compete" are "unlawful under California law . . . and so in light of such a ruling, it makes sense that the defendants would be incentivized to poach these drivers from each other." 2/25/19 Hr'g Tr. 16:2-6 (D.E. 143).

[4] *See also* 4AC ¶ 78 ("'Should you fail to do so, we will have no choice but to bring an action for intentional interference with contract or negligent interference with contract.'").

MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS
THE ANTITRUST CLAIMS IN THE FOURTH AMENDED COMPLAINT

a vast, nationwide conspiracy to restrain competition.    Plaintiffs must proffer *something* that makes their alternate reading of the facts plausible.  Their argument that an allegedly unique wrinkle in California law (which Defendants dispute) renders the straightforward explanation a pretext is no longer tenable, if it ever was.

In fact, Plaintiffs' new "nationwide" theory undercuts their conspiracy claim not only with respect to drivers in the forty-nine newly added states, but with respect to drivers in California as well.  As Plaintiffs have made clear, the Fourth Amended Complaint alleges a single scheme in place across all fifty states.  *See* Pls.' Mot. to Amend at 1 (D.E. 213-1) ("The documents received from Defendants and third parties demonstrate that the conspiracy is nationwide.").  None of Plaintiffs' allegations suggest that any Defendant treated drivers differently based on their state of residence.  On the contrary, Plaintiffs insist, "[w]hether defendants agreed not to actively solicit each other's 'under contract' employees" is a question "capable of Class-wide resolution," as is "[w]hether plaintiffs and the other Class members suffered injury as a result."  4AC ¶ 152(a), (f).  And Defendants' alleged "actions," Plaintiffs continue, "are generally applicable to the entire Class."  4AC ¶ 156.  Plaintiffs appear satisfied, moreover, with their receipt of "documents referring to drivers at the national level," assuring the Court that "defendants face little, if any, additional burden in gathering and producing documents" relevant to the new states at issue.  Pls.' Mot. to Amend at 10 (D.E. 213-1).  These assertions all but exclude the possibility that Defendants tailored any portion of the alleged conspiracy to the laws—or to the drivers—of any single state.    And this being the case, the only plausible inference is that Defendants treated *all* "under contract" drivers—including those in California—uniformly because they risked liability in most—if not all—jurisdictions if they did not.

> 2.    *The Communications Alleged in the Fourth Amended Complaint Are Not Suspicious in the Context of Alleged Nationwide Policies.*

The second plus factor previously relied upon by Plaintiffs hinges on supposedly "improper communications" among Defendants.  *See* Pls.' Opp'n to Prior

MTD at 18 (D.E. 121); *see also Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, No. 09-00560, 2013 WL 595122, at *11 (E.D. Cal. Feb. 15, 2013) (listing "suspicious communications between the defendants" among "[e]xamples of plus factors"), *aff'd*, 803 F.3d 1084 (9th Cir. 2015).   But there is nothing improper or suspicious about these communications.   The Defendants, like all motor carriers regulated by the U.S. Department of Transportation (DOT), are required by law to communicate with one another about driver candidates in the first instance.   See 49 C.F.R. § 391.23(a) (RJN, Ex. 3) (requiring verification of applicants' safety and performance records for the past three years from prior employers).   That some motor carriers respond to these inquiries by sending cease-and-desist letters also finds support in the law, because a tortious interference claim is invalid unless the alleged tortfeasor has actual knowledge of the existence of the contract.   *See, e.g., Green v. Racing Ass'n of Cent. Iowa*, 713 N.W.2d 234, 243 (Iowa 2006).   This context further demonstrates that the alleged communications between Defendants are neither suspicious nor suggestive of a conspiracy.

Not a single factual allegation in the complaint suggests that the legally required inquiries regarding applicants' past employment were somehow pretextual, or that the cease and desist letters which some Defendants sent in response to those inquiries were not sent in order to preserve a potential cause of action.   Any argument that these communications were "conspiratorial," moreover, clearly founders now that the alleged conspiracy is "nationwide."   There is nothing remotely improper about communicating with other trucking companies to determine whether an applicant is 'under contract' with another company when clearly established legal rights are at issue.   Indeed, the failure to communicate with one another could result in substantial liability for the hiring company or effectively waive a potential legal claim by the company to whom the applicant was under contract.

By insisting that the alleged conspiracy is "nationwide," in other words, Plaintiffs have again fatally undercut their prior theory of this case.   Without

16

California law casting doubt over the contractual rights at issue, it is no longer plausible to characterize the alleged communications as suggestive of a conspiracy. Rather, those communications plainly advance the independent legal interests of each Defendant and plainly fail to support the conspiracy now being alleged.[5]

        3.     *With No _Need_ to Conspire, Defendants Lacked _Any Common Motive to Do So._*

Finally, Plaintiffs claimed that Defendants had a "common motive to conspire," and that this fact was suggestive of the California conspiracy alleged in the Third Amended Complaint.  Pls.' Opp'n to Prior MTD at 18-19 (D.E. 121); *see also B & R Supermarket, Inc. v. Visa, Inc.*, No. 16-01150, 2016 WL 5725010, at *7 (N.D. Cal. Sept. 30, 2016) (suggesting that a "common motive" may indicate a conspiracy when it goes beyond "a garden-variety motive to increase profits" and is "alleged in combination with other plus factors").  "By agreeing to refrain from competing for each other's drivers," Plaintiffs argued, "Defendants were able to limit drivers from moving from one carrier to another" and "reduce their labor costs" in the process.  Pls.' Opp'n to Prior MTD at 18 (D.E. 121).

But Defendants did not *need* an unlawful agreement to achieve the purported ends of the new alleged conspiracy.  Rather, *the law itself* has proven a sufficient alternative, as courts have not only enforced the limited non-compete provisions in use by some carriers, but also protected them from interference by those carriers' competitors.  *See supra* pp. 1-2.  So while Defendants certainly had motive to limit turnover and protect their investment in driver education, they had no motive to *conspire with their competitors* to achieve those goals.  *See Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1179-80 (10th Cir. 2019) ("An inference of conspiracy is

---

[5] As one court explained recently, the "analysis of inter-firm communications" at the pleading stage "is not mechanical."  *In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, 328 F. Supp. 3d 217, 228 (S.D.N.Y. 2018).  Rather, "the probative value of such evidence depends on the participants, the information exchanged, and the context—specifically, the connection between the content and the . . . conspiracy alleged."  *Id.*

impermissible if the defendants 'had no rational economic motive to conspire . . . .'" (citation omitted)).   Put another way, it is simply not plausible to suggest that Defendants entered into a vast conspiracy in violation of the Sherman Act only to achieve what courts and juries have freely awarded in the form of injunctions and damages.  Nor is it plausible to suggest that the very parties involved in those cases would have both joined a conspiracy *and* separately pursued litigation to protect the same contractual rights.

### C.   Considered Collectively, Plaintiffs' Allegations Do Not Make a Nationwide Conspiracy Plausible.

Considered cumulatively, Plaintiffs' allegations simply do not nudge the purported nationwide conspiracy across the line from possible to plausible.  Indeed, the sum total of Plaintiffs' allegations is entirely unremarkable: each Defendant sought to ensure that drivers for whose CDL training they paid did not simply go directly to work for a competitor, and at the same time, each decided not to interfere with similar contracts in use by other carriers.  The plausible inference, Plaintiffs doggedly insist, is that these were not self-interested business decisions, but the result of a conspiracy between the Defendants.  This theory defies logic.  Plaintiffs would have this Court ignore not only Defendants' contemporaneous explanations for their actions, but also the realities of a legal landscape in which these actions make perfect sense as unilateral conduct.  Plaintiffs fill this void not with "factual matter" pointing to an "illegal agreement," *Twombly*, 550 U.S. at 556, but with unadorned *ipse dixit*.

What is more, despite insisting that eight motor carriers participated in this amorphous, multi-year conspiracy to restrain competition and depress wages nationwide, Plaintiffs offer no details as to the circumstances surrounding the formation of the actual agreement.  Nor do Plaintiffs explain *how* such an agreement between eight carriers could even possibly prove fruitful in the *nationwide* trucking industry—a market in which *hundreds of thousands* of motor carriers compete to hire *millions* of drivers.  Plaintiffs' silence on these "basic questions," *Kendall*, 518 F.3d

1  at 1048, is all the more significant given the discovery taken to date.  *See id*.  Four

2  years, five complaints, and hundreds of thousands of discovery documents into this

3  action, Plaintiffs *still* have no information to offer about the actual *agreement* that

4  supposedly resulted in a nationwide conspiracy.

5       Unsurprisingly then, Plaintiffs' efforts to date leave them far short of other no-

6  poach pleadings that courts within this circuit have deemed sufficient.  Plaintiffs in *In*

7  *re High-Tech Employee Antitrust Litig.*, for instance, alleged "an interconnected web

8  of express bilateral agreements."  856 F. Supp. 2d 1103, 1110 (N.D. Cal. 2012).

9  "Defendants' senior executives actively participated in negotiating, executing,

10 monitoring compliance with, and policing violations of the bilateral agreements,"

11 plaintiffs further alleged, and also "actively concealed each bilateral agreement,"

12 including from their own "employees [who] were not informed of, nor did they agree

13 to, the terms of any of the agreements."  *Id.*  And unlike the Fourth Amended

14 Complaint here, the complaint in *High-Tech* supplied copious details about those

15 agreements, identifying the specific individuals who entered into them, the specific

16 conspiratorial communications exchanged, and the dates and places where the

17 agreements were formed.  *Id*. at 1116-17.

18      Plaintiffs in *In re Animation Workers Antitrust Litigation*, also identified the

19 specific individuals who forged the "no poach" agreements at issue, again describing

20 specific communications between defendants and the specific days and times on

21 which the alleged agreements were memorialized. 123 F. Supp. 3d 1175 (N.D. Cal.

22 2015).  So too in *Aya Healthcare Services, Inc. v. AMN Healthcare, Inc.*, No. 17-205,

23 2018 WL 3032552, at *9-10 (S.D. Cal. June 19, 2018).  Plaintiffs there alleged written

24 contracts between the defendant and its horizontal rivals that contained express "no

25 poach" provisions, describing those provisions in detail in the complaint.  *Id.* at *2.

26      Plaintiffs' operative pleading here lacks anything approaching the specificity

27 of these cases.  Instead, the Fourth Amended Complaint is much closer to the deficient

28 effort in *Frost*, in which two courts concluded that the plaintiffs' § 1 claim required

19

1   too many inferences to withstand dismissal.  *See supra* __.  Here, as there, "Plaintiffs

2   are asking the Court to make too big a leap."  *Frost*, 2018 WL 6256790, at *5.[6]

3   **IV.  THE FOURTH AMENDED COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO ALLEGE A PER SE VIOLATION OR PLEAD A PRIMA FACIE CASE UNDER THE RULE OF REASON.**

4

5   The competitive "restraint" that plaintiffs allege in their complaint is primarily

6   vertical—*i.e.*, it arises from agreements between employers and employees—and it

7   generates judicially-recognized, procompetitive benefits.  For these reasons, it should

8   be evaluated under the rule of reason rather than the per se rule, as Plaintiffs contend.

9   And under the rule of reason, the complaint should be dismissed for failure to plead

10  either a relevant market or Defendants' market power.

11  **A.    Plaintiffs Fail to Allege a Per Se Violation of the Antitrust Laws**

12  No  agreement  among  competitors  violates  the  antitrust  laws  unless  it

13  *unreasonably* restrains trade.  *United States v. Joyce*, 895 F.3d 673, 676 (9th Cir.

14  2018).  In assessing whether a restraint is unreasonable, the "presumptive or default

15  standard" is the rule of reason, *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d

16  1118, 1132–33 (9th Cir. 2011), which requires the court to "weigh[] legitimate

17  justifications for a restraint against any anticompetitive effects." *Paladin Assocs.,

18  Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1156 (9th Cir. 2003).  Certain categories of

19  agreements, however, are deemed per se unlawful with no need to assess the

20  reasonableness of a particular restraint in light of market conditions.  *See Leegin*

21  *Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007).  This per se

22  analysis is only appropriate for "conduct that is manifestly anticompetitive, that is,

23  conduct that would always or almost always tend to restrict competition and decrease

24  output." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988).

25  _____

26  [6] Plaintiffs' Cartwright Act claim fails for the same reasons as their Sherman Act claim is deficient.  "The analysis under California's antitrust law mirrors the analysis
27  under federal law because the Cartwright Act was modeled after the Sherman Act." *County of Tuolumne v. Sonora Comty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001)
28  (citation omitted); *see also High-Tech Employee*, 856 F. Supp. 2d at 1114 .

20

"[T]he decision of what mode of analysis to apply—per se, rule of reason, or otherwise—is entirely a question of law for the Court, even though the question might involve factual disputes." *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1010 (N.D. Cal. 2008); *see* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶1909 (4th ed. 2013-2018) ("While applying any one of antitrust's modes of analysis might involve many fact questions, the ultimate selection of a mode is entirely a question of law").[7]

Here, Plaintiffs' antitrust claims are based exclusively on a per se theory of liability. *See* 4AC ¶¶ 1, 4, 7, 168, 174. But their factual allegations—even viewed in the light most favorable to Plaintiffs—describe an alleged agreement that does not fit into any of the categories that courts have condemned as illegal per se. The alleged agreement must therefore be analyzed under the rule of reason instead.

        1.    *Per Se Analysis is Inappropriate Because The Complaint Alleges Restraints that are Primarily Vertical, With a Horizontal Element*

Plaintiffs have failed to allege the kind of naked horizontal restraint for which a per se analysis is appropriate. Looking past Plaintiffs' conclusory characterizations of Defendants' alleged agreement, the underlying facts recited in the Fourth Amended Complaint describe a series of vertical non-compete agreements between Defendants and their respective drivers and trainees. The horizontal restraint alleged by Plaintiffs is, at most, an agreement not to interfere with these vertical covenants. Such an agreement is a far cry from the naked anti-poaching agreements alleged in *High-Tech*

---

[7] Because it is entirely a question of law, District Courts in the Ninth Circuit (and elsewhere) have found it appropriate to decide on the applicable mode of analysis at the pleading stage, especially when the plaintiffs base their antitrust claims exclusively on a per se theory of liability. *See, e.g. In re German Auto. Mfrs. Antitrust Litig.*, MDL No. 2796, 2020 WL 1542373, at *5-6 (N.D. Cal. Mar. 31, 2020) (applying the rule of reason granting a motion to dismiss when plaintiffs failed to adequately allege a per se violation and their allegations "contradict[ed] their assertion that the [alleged] agreements necessarily lacked any procompetitive effect"); *Jain Irrigation, Inc. v. Netafim Irrigation, Inc.*, 386 F. Supp. 3d 1308, 1314 (E.D. Cal. 2019); *Surf City Steel, Inc. v. Int'l Longshore & Warehouse Union*, No. 14-05604, 2017 WL 5973279, at *6–7 (C.D. Cal. Mar. 7, 2017), *aff'd*, 780 F. App'x 467 (9th Cir. 2019).

*Employees*, which were unrelated to any vertical restraints, and lacked any procompetitive justification.

It is indisputable that vertical restraints, such as employee non-compete agreements, are evaluated under the rule of reason. *See*, e.g., *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 900 (9th Cir. 1983) ("Employee covenants not to compete or interfere with the employer's business after the end of the employment relationship should not be tested under the per se rule."); *National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 689 (1978).

So too, a horizontal agreement not to interfere with another's driver contracts should also be evaluated under the rule of reason: it does not fit into any traditional category of per se unlawful restraints which courts, after considerable experience, can safely conclude lacks any procompetitive justification. Per se analysis is reserved for a limited set of naked, horizontal agreements that are *always* anticompetitive and lack any procompetitive justification—things like market allocation, bid rigging, tying arrangements, and price fixing. *See, e.g., N. Pac. Ry. v. United States*, 356 U.S. 1, 5 (1958) (per se category reserved for agreements "which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable"). "It is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act." *United States v. Topco Assocs. Inc.*, 405 U.S. 596, 607-08 (1972); *see also Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1284 (7th Cir. 1983) ("A particular course of conduct will not be termed a per se violation ... until the courts have had considerable experience with that type of conduct…").

Courts have had relatively little experience with horizontal agreements to honor their competitors' vertical, non-compete agreements. The experience courts have had strongly suggests not only that per se treatment is inappropriate, but that such agreements are not unlawful at all when evaluated under the rule of reason. Analyzing an analogous, mixed vertical/horizontal restraint, for example, the district court in

22

*Hanger v. Berkley Group, Inc.*, found that an express agreement among competitors to honor the non-compete provisions in each other's employment agreements was not per se illegal, and granted defendant's motion to dismiss.  No. 13-113, 2015 WL 3439255 (W.D. Va. May 28, 2015).  The horizontal agreement, it said, was "*little more than a covenant not to violate the law by intentionally interfering with each other's employment contracts*."  *Id.* at *7 (emphasis added).

Indeed, Judge Manuel L. Real of the Central District of California expressly approved a similar agreement between CRST and a competitor, requiring that competitor to refrain from interfering with CRST's non-compete agreements with its drivers.  *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, Case No. 04-04676 (C.D. Cal. July 23, 2007) (D.E. 61) (RJN, Ex. 2).  Judge Real deemed that horizontal agreement to be "proper and lawful."  *Id.* at 2.

In short, judicial experience with the type of mixed restraint at issue here reflects its lawfulness under a rule of reason analysis, *not* its "pernicious effect on competition and lack of any redeeming virtue."  *N. Pac. Ry.,* 356 U.S. at 5.

> ### 2.     The Mixed Restraints Alleged Here Must Be Analyzed Under the Rule of Reason Because They Have Procompetitive Effects.

The mixed restraints alleged here are also *inappropriate* for per se analysis because they have plausible procompetitive benefits.  *See Paladin Assocs.*, 328 F.3d at 1155 ("When a defendant advances plausible arguments that a practice enhances overall efficiency and makes markets more competitive, per se treatment is inappropriate, and the rule of reason applies."); *see also Cal. Dental Ass'n v. FTC,* 526 U.S. 756, 770 (1999).

It is no exaggeration to state that most of the putative class members in this case would not be truck drivers at all but for the type of restraint at issue here.  The use of non-compete covenants enables Defendants to make significant investments in driver training and recruitment in order to mitigate a national driver shortage and to augment the pool of qualified drivers.  Such covenants are well-recognized as a

legitimate, pro-competitive practice:

> [T]he employer may spend significant resources training an employee, but this training could readily be misappropriated by an alternative employer, who could afford to pay more because the cost of training has already been paid. . . . The first employer may combat such defections by insisting on an agreement that after training is completed the employee may not accept work from a rival for a significant period—say, five years.

Areeda & Hovenkamp, ¶ 2134.

Indeed, courts have acknowledged procompetitive benefits of the very contracts at issue here.  In *CRST Van Expedited*, 2006 WL 335765, at *1, a federal district court in Oklahoma enjoined J.B. Hunt from interfering with CRST's student driver employment agreements by soliciting and hiring them during the terms of their non-compete covenants.  The court recognized that competitors' respect for those covenants was essential to CRST's ability to expand the pool of qualified drivers in the midst of the ongoing driver shortage:

> CRST is . . . entitled to pursue its new driver training strategy[,] . . . the implementation [of which] necessarily requires that CRST have some . . . contractual means, of protecting its substantial investment in new driver training. . . . [A]t a time of serious and chronic driver shortages, there is a social interest in protecting the lawful means by which industry competitors, such as CRST, have implemented driver development and training programs which enlarge the pool of available drivers and make attractive training and employment opportunities available to individuals who could not otherwise afford to pay the cost of entry into the pool of available long-haul drivers.

*Id.* at *17-18.[8]  The judicially recognized, procompetitive benefits of the restraint at issue make clear, in other words, that per se condemnation is unwarranted.

---

[8] The court also recognized that CRST's driver training program "confers a substantial benefit on the newly-minted professional driver" and acknowledged that the provisions of its contracts requiring the driver to drive for CRST for a specified term or repay training costs were essential "for the purpose of protecting [CRST's] investment in putting a new driver on the road."  *CRST Van Expedited, Inc. v. J.B. Hunt Transp., Inc.*, No. 04-651, 2006 WL 335765, at *13 (W.D. Okla. Feb. 14, 2006).

### B.  Plaintiffs Fail to Allege a Prima Facie Case Under the Rule of Reason.

Because Plaintiffs assert liability based exclusively—but incorrectly—on per se illegality, dismissal is warranted without further analysis.  *See Jain Irrigation, Inc. v. Netafim Irrigation, Inc.*, 386 F. Supp. 3d 1308, 1315 (E.D. Cal. 2019).  But even if the Court proceeded to analyze Plaintiffs' allegations under the rule of reason, the Fourth Amended Complaint must still be dismissed due to Plaintiffs' failure to allege the facts necessary to plead a prima facie case under that mode of analysis.

To state a rule of reason claim, a plaintiff must identify a "relevant market," *see Tanaka v. Univ. S. Cal.*, 252 F.3d 1059, 1063-64 (9th Cir. 2001), which must be defined in terms of both product and geography, *see Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 n. 4 (9th Cir. 2008).  Plaintiffs offer no allegations as to the relevant market here, and their failure to do so warrants dismissal.  *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018); *see also In re German Auto. Mfrs. Antitrust Litig.*, MDL No. 2796, 2020 WL 1542373, at *6 (N.D. Cal. Mar. 31, 2020) (where plaintiffs alleged only a per se violation, granting motion to dismiss after determining that rule of reason analysis was appropriate).

Under the rule of reason, if the complaint properly identifies a relevant market, the plaintiff also bears the burden of plausibly alleging that the defendant has "market power" within that market—otherwise the defendant's restraint on trade would not have a substantial anticompetitive effect.  *See Newcal Indus.*, 513 F.3d at 1044-45.  Market power can be demonstrated by evidence "that the defendant owns a dominant share of [the relevant] market" and "that there are significant barriers to entry and . . . existing competitors lack the capacity to increase their output in the short run."  *Id.*  Here again, Plaintiffs have alleged no facts that would support a finding that Defendants have market power in any market.  *See, e.g. Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) ("[c]ourts generally require a 65% market share to establish a prima facie case of market

25

power.").[9]  This failure is fatal to any potential rule of reason claim.

## V.  PLAINTIFFS' CLAIMS FOR NATIONWIDE DAMAGES PRIOR TO APRIL 15, 2016 ARE BARRED BY THE STATUTE OF LIMITATIONS.

Plaintiffs' Fourth Amended Complaint purports to assert antitrust claims on behalf of "[a]ll current or former drivers 'under contract' . . . with" any of the eight Defendants "at any time from May 15, 2013 to the present." 4AC ¶ 147(a). It expands the putative class that Plaintiffs proposed in their Third Amended Complaint in two significant ways: (1) to include *all* drivers in the United States—not only those who resided in California—who were "under contract" with a named Defendant; and (2) to include all drivers "under contract" with three additional carriers: Covenant, Paschall, and Stevens.  With respect to these two groups, claims were advanced for the first time on April 15, 2020.  The statute of limitations for both the Sherman Act and the Cartwright Act is four years.  *See* 15 U.S.C. § 15b; Cal. Bus. & Prof. Code § 16750.1.  Any claims for damages on behalf of these drivers for the period May 15, 2013 through April 15, 2016 are accordingly time-barred.

### A.  The Fourth Amended Complaint Does Not Relate Back To Plaintiffs' Earlier Complaints.

Federal Rule of Civil Procedure 15(c) governs whether an amendment to a pleading relates back to the date of an earlier pleading.  An amendment seeking to add a plaintiff, including by expanding the scope of a proposed class, relates back to the original complaint under Rule 15(c) only when: "1) the original complaint gave the defendant adequate notice of the claims of the newly proposed plaintiff; 2) the relation back does not unfairly prejudice the defendant; and 3) there is an identity of interests between the original and newly proposed plaintiff." *Rosenbaum v. Syntex Corp. (In re Syntex Corp. Sec. Litig.)*, 95 F.3d 922, 935 (9th Cir. 1996); *Willner v.*

---

[9] Nor could they possibly do so:  it is wholly implausible that the named Defendants here—representing a miniscule fraction of the hundreds of thousands of truck companies in the U.S.—have such a dominant share of any national market for the services of truck drivers that they are able to control wage levels nationally for any class of truckers.

*Manpower, Inc.*, No. 11-2846, 2014 WL 2939732, at *4 (N.D. Cal. June 30, 2014). The Fourth Amended Complaint—which expands the putative class in two ways as set forth above—fails to satisfy any of the three requirements for relation back.

> 1.  *Plaintiffs' Prior Complaints Did Not Give Defendants Adequate Notice of the Claims of the Newly Proposed Class Members.*

"In deciding whether an amendment relates back to the original claim, notice to the opposing party of the existence and involvement of the new plaintiff is the critical element." *Avila v. I.N.S.,* 731 F.2d 616, 620 (9th Cir. 1984). "In the context of amendments that seek to expand the scope of a putative class, the notice requirement is satisfied when 'the original complaint gave the defendant adequate notice of the claims of the newly proposed plaintiff [.]'" *Willner,* 2014 WL 2939732, at *4 (alteration in original) (citing *Syntex Corp.,* 95 F.3d at 935). "[N]otice must be determined based on the contents of the complaint alone." *Id.*

Here, none of the prior iterations of the complaint gave notice to Defendants of the claims of either non-California drivers or drivers "under contract" with the newly added Defendants. Rather, such complaints *expressly* limited the scope of the putative class to *exclude* such drivers. *See, e.g., Zinman v. Wal-Mart Stores, Inc.,* No. 09-02045, 2010 WL 2230449, at *2 (N.D. Cal. June 1, 2010) (proposed amended complaint did not relate back where prior complaint failed to provide notice to defendant of claims of additional types of employees who would be added to putative class by amended complaint); *see also Cliff v. Payco Gen. Am. Credits, Inc.,* 363 F.3d 1113, 1132–33 (11th Cir. 2004). Accordingly, the notice requirement is not met.

> 2.  *There Is Not an Identity of Interests Between Plaintiffs and the Newly Proposed Class Members, and Relation Back Would Unfairly Prejudice Defendants.*

Identity of interest exists between an original plaintiff and a new plaintiff when "[t]he circumstances giving rise to the claim remained the same as under the original complaint." *Raynor Bros. v. Am. Cyanimid Co.,* 695 F.2d 382, 384 (9th Cir. 1982). Conversely, identity of interest is not present when the "focus of the litigation changed

distinctly upon the amendment of the complaint." *Besig v. Dolphin Boating & Swimming Club*, 683 F.2d 1271, 1279 (9th Cir. 1982). Here, the four named Plaintiffs are all current or former California residents. *See* 4AC ¶¶ 14-17. None of them alleges being "under contract" with Covenant, Paschall, or Stevens. By expanding the putative class beyond their own limited experience, Plaintiffs have changed the focus of the litigation—from an alleged conspiracy limited in geographic scope, to a markedly different one covering an area many times larger. Thus, there is no "identity of interest" between Plaintiffs and either of the two new groups of drivers they purport to represent.

The elements of identity of interest and prejudice go hand in hand. When new and former plaintiffs "have sufficient identity of interests, relation back of the amendment is not prejudicial to the defendant." *Raynor Bros.*, 695 F.2d at 384). Here, however, the earlier complaints provided no notice of the new claims at issue, and there is no identity of interests between old Plaintiffs and new. Relation back would therefore clearly prejudice Defendants.

**B.    Plaintiffs' Cursory Allegations of Fraudulent Concealment Are Insufficient To Toll The Statutes of Limitations.**

Apparently recognizing the claims of their expanded class do not relate back, Plaintiffs attempt to rely on fraudulent concealment instead. *See* 4AC ¶¶ 159-64. Under that doctrine, "[a] statute of limitations may be tolled if the defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence." *Hexcel Corp. v. Ineos Polymers, Inc.,* 681 F.3d 1055, 1060 (9th Cir. 2012). For the doctrine to apply, however, the plaintiff must allege (and ultimately prove) facts sufficient to establish that: (1) the defendant took affirmative acts to mislead the plaintiff; (2) the plaintiff did not have "actual []or constructive knowledge of the facts giving rise to its claim"; and (3) the plaintiff acted diligently in trying to uncover the facts giving rise to its claim. *Id.* Moreover, since allegations of fraudulent concealment sound in fraud, they

are subject to Rule 9(b) and Plaintiffs "must plead with particularity the circumstances of the concealment and the facts supporting its due diligence." *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 502 (9th Cir. 1988).

Here, Plaintiffs fail to state the elements of fraudulent concealment with the required particularity.  First, they fail to identify with any specificity an "affirmative act to mislead."  Instead, they allege only that "Defendants' conspiracy was concealed and carried out in a manner specifically designed to avoid detection." 4AC ¶ 161. The only potentially "affirmative act" alleged by Plaintiffs is that Defendants "consistently represented to Class members that their compensation was fair and competitive despite knowing that the compensation was in part the product of a collusive market" which supposedly "lulled plaintiffs and Class members into believing that the compensation . . . was determined in a competitive market." *Id.* ¶¶ 162-163. However, Plaintiffs identify no specific instance of any Defendant actually making such an allegedly false representation. Such conclusory and vague allegations are insufficient to state fraudulent concealment as a matter of law. *See, e.g., In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1215-17 (N.D. Cal. 2015) (concluding that Plaintiffs' conclusory allegations that defendants engaged in a "secret conspiracy" and that Defendants' conspiracy was concealed were insufficient as a matter of law, as were allegedly "'pretextual, incomplete or materially false and misleading explanations for hiring, recruiting and compensation decisions made pursuant to the conspiracy'" (internal citation omitted)).

Second, notwithstanding Plaintiffs' formulaic assertions they "had neither actual nor constructive knowledge of the pertinent facts of the conspiracy constituting [the newly proposed class members'] claims for relief " and "did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of any conspiracy," 4AC ¶ 159, their prior pleadings in this case demonstrate otherwise.  "The plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would

29

have led to the discovery of the fraud." *Beneficial Standard Life Ins. Co. v. Madariaga,* 851 F.2d 271, 275 (9th Cir. 1988). Here, Plaintiffs were obviously aware of the possible existence of a conspiracy by no later than July 26, 2018, when they filed their Third Amended Complaint *actually alleging a conspiracy*. The information supporting that pleading was undoubtedly sufficient to warrant an investigation.

Finally, Plaintiffs do not even attempt to allege any facts that would support a claim that they acted diligently. Instead, they attempt to circumvent this requirement by claiming that they "did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of any conspiracy." 4AC ¶ 159. This is demonstrably false, as Plaintiffs clearly believed they had discovered the existence of a conspiracy by no later than July 26, 2018. And Plaintiffs fail to allege what actions they took after this date to support their claim of "reasonable diligence."

In short, Plaintiffs rely only on "conclusory statements" and fall short of their obligation to "plead with particularity the circumstances surrounding the concealment" accordingly. *Rutledge v. Boston Woven Hose & Rubber Co.,* 576 F.2d 248, 250 (9th Cir. 1978); *In re Packaged Seafood Prods. Antitrust Litig.*, No. 15-2670, 2017 WL 35571, at *14-16 (S.D. Cal. Jan. 3, 2017); *In re Animation Workers Antitrust Litig.,* 87 F. Supp. 3d at 1216. Accordingly, the doctrine of fraudulent concealment does not toll the limitations period for the newly expanded putative class.

## CONCLUSION

For the foregoing reasons, the antitrust claims in the Fourth Amended Complaint should be dismissed in their entirety with prejudice.

1   Respectfully submitted,

2

3   DATED: June 4, 2020

4                                   **PILLSBURY WINTHROP SHAW**
                                    **PITTMAN LLP**
5

6                                   By: /s/ *James V. Dick*
                                    JAMES V. DICK
7                                   JEETANDER T. DULANI

8                                   **SCOPELITIS,    GARVIN,    LIGHT,**
9                                   **HANSON & FEARY, P.C.**

10
                                    By: /s/ *James H. Hanson*
11                                  CHRISTOPHER C. MCNATT, JR.
                                    JAMES H. HANSON
12                                  R. JAY TAYLOR, JR.
13                                  CHARLES ANDREWSCAVAGE

14
                                    *Attorneys for Defendants*
15                                  *CRST INTERNATIONAL, INC. and*
                                    *CRST EXPEDITED, INC.*
16

17                                  **MCGUIREWOODS LLP**

18                                  By: /s/ *Nicholas J. Giles*
19                                  MATHEW C. KANE
                                    AMY E. BEVERLIN
20                                  AMY MANNING
                                    J. BRENT JUSTUS
21                                  NICHOLAS J. GILES
22                                  JASON LELAND CHRESTIONSON

23
                                    *Attorneys for*
24                                  *SCHNEIDER NATIONAL CARRIERS, INC.*

25

26

27

28
                                           31

**NOSSAMAN LLP**

By: /s/ *Drew R. Hansen*
DREW R. HANSEN
SETH M. GOLDSTEIN

*Attorneys for Defendant*
*C.R. ENGLAND, INC.*

**VARNER & BRANDT LLP**

By:    /s/ *Jeff T. Olsen*
Richard D. Marca
Jeff T. Olsen
Ankit H. Bhakta

*Attorneys for Defendant*
*WESTERN EXPRESS, INC.*

*All signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.*

MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS
THE ANTITRUST CLAIMS IN THE FOURTH AMENDED COMPLAINT