UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.:  5:17-cv-01261-SB-SP | Date:    February 24, 2022 |
|---|---|

| Title:  *Curtis Markson et al. v. CRST International, Inc. et al.* |
|---|

| Present: The Honorable | **STANLEY BLUMENFELD, JR., U.S. District Judge** |
|---|---|

| Jennifer Graciano | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Appearing | None Appearing |

**Proceedings:     ORDER DENYING MOTIONS FOR CLASS CERTIFICATION
[Dkt. Nos. 482, 483]**

Plaintiffs—four commercial truck drivers who worked for various Defendants—filed two motions for class certification.  The first, related to Plaintiffs' California employment claims, seeks to certify a class of former employees of CRST Expedited, Inc. and a subclass of such employees whose employment ended in a narrower class period or who opted out of the settlement in a related class-action.  Dkt. No. 482.  The second motion, related to Plaintiffs' antitrust claims, seeks to certify a class of drivers who signed certain employment contracts with any of the four non-settling Defendants—CRST International, Inc. and CRST Expedited, Inc. (together, CRST), C.R. England, Inc. (CRE), and Stevens Transport, Inc. (Stevens)—and, for purposes of Plaintiffs' claim under the Cartwright Act, a subclass of those drivers who resided in California.  Dkt. No. 483.  After the motions were fully briefed, Plaintiffs filed a notice that they had reached a settlement with Stevens, subject to Court approval.  Dkt. No. 555.

Plaintiffs' motion to certify antitrust claims is therefore **denied** as moot as to Stevens.  As to CRST and CRE, the Court **denies** both motions on the merits.[1]

## I.    BACKGROUND

In their Fourth Amended Complaint, Plaintiffs allege that:  (1) trucking companies including CRST, CRE, and Stevens (collectively, Defendants[2]) conspired to restrain compensation among themselves by refusing to hire employees who remain "under contract" with another trucking company; and (2) CRST Expedited, Inc. (CRST Expedited) violated the California Labor Code by deducting certain fees from its employees' pay.  Dkt. No. 228.

---

[1] Nearly four weeks after Plaintiffs filed their reply brief in support of their Antitrust Motion, Defendants filed an evidentiary objection (which seeks to admit a supplemental declaration from Defendants' expert) and a request for leave to file a surreply, both in response to what they characterize as improper new evidence and arguments in Plaintiffs' reply brief.  Dkt. Nos. 533, 534.  Defendants did not confer with Plaintiffs before filing these documents, at least one of which is properly construed as a motion subject to Local Rule 7-3.  "Filing of surreplies is highly disfavored, as it typically constitutes a party's improper attempt to have the last word on an issue." *Smith v. United States*, No. 2:13-CV-039-JAD-GWF, 2014 WL 1301357, at *5 (D. Nev. Mar. 28, 2014).  The arguments and evidence in Plaintiffs' reply to which Defendants object were directly responsive to Defendants' arguments, and therefore neither improper nor a basis for allowing leave to file a surreply.  *See Applied Materials, Inc. v. Demaray LLC*, No. 5:20-CV-05676-EJD, 2020 WL 8515132, at *1 (N.D. Cal. Dec. 16, 2020) ("[E]vidence submitted with a reply brief is not new evidence when it is submitted to rebut arguments raised in the opposition brief.").  Accordingly, Defendants' objection and motion for leave are **DENIED**.

[2] Because Stevens fully participated in the briefing on the class certification motions before settling and is discussed extensively in the parties' analysis, references in this Order to Defendants include Stevens, except that any merits ruling on the arguments raised by Defendants does not apply to Stevens.  Plaintiffs also alleged claims against five other trucking companies that settled before Plaintiffs moved for class certification:  Western Express, Inc., Schneider National Carriers, Inc., Southern Refrigerated Transport, Inc., Covenant Transport, Inc., and Paschall Truck Lines, Inc. (collectively, the Settling Defendants).

### A.      <u>Antitrust Allegations</u>

Defendants are among the nation's largest transportation companies, and they actively recruit and hire truck drivers every year. *Id.* ¶¶ 29, 55.  The industry has a significant and worsening driver shortage, which arises in large part from extremely high turnover rates of approximately 100% each year. *Id.* ¶¶ 47–49. Working as a truck driver in the United States requires a commercial driver's license (CLD), which is usually obtained after attending a trucking school. *Id.* ¶ 56.  Trucking schools typically cost between $1,500 and $7,000 and last up to four weeks. *Id.*

Several trucking companies, including all four Defendants, offer company-sponsored trucking schools at which they cover the cost of the school and training costs in exchange for a promise to work for the trucking company. *Id.* ¶ 60.  To qualify, driver recruits must sign employment contracts in which they agree to work for the company for a certain period of time (for example, 10 months for CRST and 9 months for CRE). *Id.*  The contracts provide that if the driver is terminated or withdraws from employment before completing the employment term, the driver is obligated to repay all amounts advanced for tuition and costs of training. *Id.*  However, if the driver remains employed for the entire contract period, most of the training costs are waived. *Id.* ¶ 61.

Plaintiffs allege that drivers who attend Defendants' driving schools are considered "under contract" while employed during the contract period or, if they are terminated or quit before completing the contract period, until they repay the tuition and training costs with interest. *Id.*  Defendants allegedly conspired and agreed not to hire drivers who are "under contract" with another trucking company, even if the driver was terminated and is ineligible to work for the employer with which the driver is under contract. *Id.* ¶¶ 61–62.  Defendants check with each other to find out whether applicants are "under contract," and if so, revoke or decline to extend offers of employment. *Id.* ¶ 64.  Plaintiffs allege that this practice is anticompetitive and that if Defendants were acting in their individual self-interest, they would not inform their competitors that they were offering jobs to their competitors' current or former employees, nor would they decline to hire qualified applicants who are "under contract" with a competitor. *Id.*

Plaintiff Clois McClendon completed CRST's driving school in 2016 but was terminated a few weeks after completing his training because of an at-fault accident. *Id.* ¶¶ 65-66.  CRE and Western Express, Inc. (one of the Settling Defendants) both initiated the process of hiring McClendon but then refused to hire

him when they found out that he was "under contract" with CRST.  *Id.* ¶¶ 67–71. Plaintiff Eric Clark attended driving school and signed a nine-month employment contract with CRE in 2017 but was terminated a few weeks after completing his training because of an at-fault accident.  *Id.* ¶¶ 72–73.  Two of the Settling Defendants began the process of hiring Clark but refused to proceed once they learned that he was "under contract" with CRE.  *Id.* ¶¶ 73–74.

## B.      California Labor Code Allegations

CRST Expedited, which has one of the industry's largest fleets with more than 3,500 drivers, offers an expedited driver training program consisting of four phases:  (1) driver training at an educational facility that CRST Expedited operates in Iowa, or at other training schools throughout the country with which CRST Expedited partners; (2) an orientation program held at a site selected by CRST Expedited; (3) hands-on driving training with a lead driver; and (4) a professional development program consisting of classroom training and a mentoring program. *Id.* ¶¶ 85–90.  Once at the educational facility, student drivers are required to sign a Pre-Employment Driver Training Agreement.  *Id.* ¶ 91.  Pursuant to the agreement, the student drivers are advanced tuition as well as costs of transportation, lodging, and other expenses.  *Id.* ¶ 93.  If student drivers are dismissed or withdraw from the program before beginning the third phase, they must repay the full amounts advanced for tuition, lodging, and transportation, as well as for physical and drug screening tests.  *Id.* ¶ 96.

After completing the second phase of the training program, student drivers execute a Driver Employment Contract and become employees of CRST Expedited.  *Id.* ¶ 98.  The employment contracts provide for a term of ten months of employment, and during that time, CRST Expedited begins deducting up to $40 per week from the drivers' paychecks to repay the amounts advanced for physical and drug screening tests, lodging, and transportation, along with interest.  *Id.* ¶¶ 102–03.  If a driver breaches the employment contract or is terminated for cause before completing the contract period, the driver must immediately pay CRST Expedited $6,500 plus the advanced costs and interest.  *Id.* ¶ 104.

Plaintiff Curtis Markson attended training in 2012 and signed an employment agreement with CRST Expedited but lost his job after his license lapsed.  *Id.* ¶¶ 75–76.  Markson returned to CRST in 2016 and was required to participate in the driver training program.  *Id.* ¶ 105.  Once he started driving, Markson found he was earning far less money than he had expected based on CRST's representations and that CRST deducted the cost of his drug screening test

from his pay.  *Id.* ¶¶ 108–09.  After Markson secured employment with another trucking company in February 2017, CRST charged him $6,500 against his earned wages and employed a collections agency to pursue the unpaid amount.  *Id.* ¶ 110.

Plaintiff Mark McGeorge similarly completed CRST's driver training program, signed an employment contract with CRST, and began working for CRST in 2016.  *Id.* ¶¶ 112–117.  CRST deducted from his pay charges for his drug screening, a housing fee that exceeded the housing costs he had incurred during training, and an additional unidentified deduction.  *Id.* ¶¶ 117–18.  When McGeorge left his employment with CRST Expedited, CRST deducted from his final paycheck all of the wages he had earned during that pay period and applied that sum to the $6,500 fee assessed against him.  *Id.* ¶ 121.  CRST also retained a firm to collect the amounts it claimed McGeorge still owed it.  *Id.* ¶ 123.

Plaintiffs allege that CRST engaged in a longstanding and uniform practice of deducting wages from the final paychecks of drivers who did not complete their employment terms, that the $6,500 penalty is unreasonable and designed to deter drivers from ending their employment, and that the other charges deducted from drivers' pay are unreasonable and unlawful, all in violation of California law.  *Id.* ¶¶ 122, 127–31.

## C.    **Plaintiffs' Claims**

Plaintiffs in their Fourth Amended Complaint allege claims against all Defendants for (1) violation of the Sherman Act, 15 U.S.C. § 1, and (2) violation of the Cartwright Act, Cal. Bus. & Prof. Code § 16720; and against CRST for (3) unreasonable liquidated damages clause in violation of Cal. Civil Code § 1671; (4) unfair business practices in violation of Cal. Bus. & Prof. Code §§ 16600 and 17200; (5) failure to indemnify necessary expenditures in violation of Cal. Labor Code § 2802; (6) failure to pay earned wages in violation of Cal. Labor Code §§ 201 and 202; and (7) civil penalties under the California Private Attorneys General Act, Cal. Lab. Code § 2699 (PAGA).  Dkt. No. 228.  Plaintiffs filed two motions to certify classes, one focused on Plaintiffs' wage-related claims against CRST and the other focused on Plaintiffs' antitrust claims against all Defendants.  Dkt. Nos. 482, 483.

## II.    **LEGAL STANDARD**

A class action is the exception to the rule requiring a lawsuit to be individually prosecuted.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348

(2011).  To justify a departure from the rule, the moving party must satisfy a two-part test.  First, the plaintiffs must demonstrate through facts rather than allegations that the proposed class satisfies the requirements of Rule 23(a):  (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation by the class representatives and class counsel.  Fed. R. Civ. P. 23(a); *see Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1309 (9th Cir. 1977) (mere allegations insufficient).  Second, the plaintiffs must meet at least one of the three requirements of Rule 23(b).  Here, Plaintiffs invoke Rule 23(b)(2) and (3).  Under Rule 23(b)(2), a class may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Under Rule 23(b)(3), a class may be maintained if "questions of law or fact common to class members predominate over any questions affecting only individual members" and if "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The moving party bears the burden of showing Rule 23 is satisfied, *see Marlo v. UPS*, 639 F.3d 942, 947 (9th Cir. 2011), and the reviewing court must rigorously analyze whether that burden has been satisfied, including consideration of the merits when they overlap with the procedural requirements, *Dukes*, 564 U.S. at 350-51.

## III.    DISCUSSION

### A.    California Wage Claims Class

Plaintiffs Markson, McGeorge, and McClendon move to certify the following class (the CRST Driver Class) under Rule 23(b)(2) and (3):

> All persons who (1) signed a Pre-Employment Driver Training Agreement or Driver Employment Contract with Defendant CRST Expedited, Inc., (2) participated in CRST Expedited, Inc.'s Driver Training Program in California, and (3) were charged for their DOT physical, DOT drug screening, administrative fees, and/or the $3,950 or $6,500 Contract Fee after failing to complete their contractually-required 8 to 10 month Employment Term, at any time between May 15, 2013 through the date of the Court's class certification order.

Dkt. No. 482 at 1.  Plaintiffs also seek to certify the following subclass (the CRST 2013 Subclass):

> All persons who (1) signed a Pre-Employment Driver Training
> Agreement or Driver Employment Contract with Defendant CRST
> Expedited, Inc., (2) participated in CRST Expedited, Inc.'s Driver
> Training Program in California, and (3) were charged for their DOT
> physical, DOT drug screening, administrative fees, and/or the $3,950
> or $6,500 Contract Fee after failing to complete their contractually-
> required 8 to 10 month Employment Term, at any time between May
> 15, 2013 through January 21, 2014, or who opted-out of the settlement
> in *Montoya et al. v. CRST Expedited, Inc., et al.*

*Id.* Plaintiffs seek to certify the CRST Driver Class with respect to Counts Three through Six and the CRST Subclass with respect to Counts Three through Five. *Id.* at 1–2. Their motion is thus focused on their allegations that CRST made unlawful deductions from its California drivers' pay for physicals, drug tests, administrative fees, and training costs. Plaintiffs represent that the CRST Driver Class includes approximately 4,750 drivers and the CRST 2013 Subclass includes approximately 630 drivers. Dkt. No. 482-1 at 2.

### 1. The *Montoya* Settlement

The parties' dispute about the propriety of certification focuses on the effect of the class settlement in the related *Montoya* case filed against CRST. In that suit, filed in January 2016 to challenge essentially the same practices at issue here, the court certified a class consisting of "[a]ll individuals who have participated as contract drivers in any phase of CRST's Driver Training Program at any time since January 21, 2014 . . . who faced training-related wage deductions and/or collections." *Montoya v. CRST Expedited, Inc.*, 311 F. Supp. 3d 411, 424–26 (D. Mass. 2018). The parties in *Montoya* resolved their suit through a class settlement that was approved by the court on May 27, 2021. Dkt. No. 501-5. The settlement included a broad release of claims that were "brought or could have been brought" on behalf of the class, including

> any claim (i) seeking any type of relief, including compensatory,
> consequential, liquidated, multiple, exemplary, statutory or punitive
> damages, rescission, or declaratory or injunctive relief; (ii) based on a
> violation of any state or federal wage payment statute or regulation; or
> (iii) based on any state or federal consumer protection statute or
> regulation, for which any class member might seek relief that was
> brought, or could have been brought on behalf of the classes and/or
> collectives of which those individuals are a part in the *Montoya*,

> *Smith*, and/or *Wimbish* litigation or any similar litigation in any state or federal court in the United States during or based on facts arising in the applicable time periods.

Dkt. No. 501-10 at 13–14.  The settlement expressly exempted from release the *antitrust* claims filed in this suit but made no similar exemption for the wage-related claims.  *Id.* at 14 ("This release also does not include the claims pled in *Markson, et al. v. CRST International, Inc., et al.*, United States District Court, Central District of California, Case No. 5:17-cv-01261-SB-SPx, that arise under state or federal antitrust laws or any derivative California Unfair Competition Law claim based on such antitrust claims.").

Plaintiffs Markson, McGeorge, and McClendon—the three proposed class representatives for the CRST Driver Class and the CRST 2013 Subclass—opted out of the *Montoya* settlement.  Dkt. Nos. 501-16, 501-17, 501-18.  Including Plaintiffs, only eight drivers requested exclusion from the settlement.  Dkt. No. 501-13 at 7.

### 2.    The Effect of the *Montoya* Settlement

CRST argues that the *Montoya* settlement precludes class certification for two independent but related reasons.  First, after opting out of the *Montoya* settlement, Plaintiffs may only pursue individual claims against CRST and may not file a new class action.  *See Wai Hoe Liew v. Cohen & Slamowitz, LLP*, 265 F. Supp. 3d 260, 275 (E.D.N.Y. 2017) ("[A] person who opts out of a class action can pursue his or her individual claims, but not class claims arising from the same core facts. . . . If opt-out plaintiffs wish to pursue their individual claims, they must do so individually, and not as a resurrected class asserting claims arising from factual predicates identical to those asserted in the prior class action from which they opted out.").  Second, because almost all class members are subject to the release in the *Montoya* settlement, Plaintiffs, who opted out of the settlement, are not typical or adequate representatives of the class.  Plaintiffs argue that their decision to opt out of *Montoya* does not bar their class claims in this suit, which was filed long before the *Montoya* settlement.  It is unnecessary to resolve this dispute, however, because even if Plaintiffs' class claims are not barred, Plaintiffs are not typical and adequate representatives.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The plaintiffs must show that:  (1) "other members have the same or similar

injury"; (2) "the action is based on conduct which is not unique to the named plaintiffs"; and (3) "other class members have been injured by the same course of conduct." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011). Further, Rule 23(a)(4) requires that the representative party "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "This requirement is grounded in constitutional due process concerns: 'absent class members must be afforded adequate representation before entry of a judgment which binds them.'" *Evans v. IAC/Interactive Corp.*, 244 F.R.D. 568, 577 (C.D. Cal. 2007). Representation is adequate if (1) the named plaintiffs and their counsel are able to prosecute the action vigorously; (2) the named plaintiffs do not have conflicting interests with the unnamed class members; and (3) the attorney representing the class is qualified and competent. *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978).

Plaintiffs contend that the CRST Driver Class includes approximately 4,750 drivers who signed contracts with, and were trained by, CRST, and were charged improper fees after not completing their contracts during the time from May 15, 2013 to the present. The vast majority of that eight-year class period (all but the eight months between May 15, 2013 and January 21, 2014) was included in the class period in *Montoya*. Out of the nearly 5,000 class members, at most eight—including the named Plaintiffs—opted out of the *Montoya* settlement. Plaintiffs are therefore decidedly atypical of the class in this respect, regardless of the similarity of their claims.

If the Court were to certify the CRST Driver Class, a central issue—perhaps *the* central issue—would be whether the claims of the *Montoya* class members were released by the settlement. Indeed, Plaintiffs identify "the impact, if any, of the settlement reached in [*Montoya*] on the claims of the CRST California Driver Class" as one of the common questions in this case. Dkt. No. 482-1 at 11. Plaintiffs argue that the impact of the *Montoya* settlement is a merits question to be decided on a class-wide basis and argue that in fact the settlement does not preclude the claims, but their argument misses the point. On this central issue, Plaintiffs have no standing and no individual incentive to make any argument whatsoever regarding whether the *Montoya* waiver from which they opted out precludes the claims of absent class members who are bound by the *Montoya* settlement. Markson, McGeorge, and McClendon therefore are neither typical nor adequate class representatives of the proposed CRST Driver Class. *See Lawson v. Grubhub, Inc.*, 13 F.4th 908, 913 (9th Cir. 2021) ("All members of Lawson's putative class—except Lawson and one other—signed agreements waiving their right to participate in a class action. The district court correctly held Lawson could

not satisfy the requirements in Rule 23(a) because he is neither typical of the class nor an adequate representative, and because the proceedings would be unlikely to generate common answers."); *Avilez v. Pinkerton Gov't Servs., Inc.*, 596 F. App'x 579, 579 (9th Cir. 2015) (holding that "[t]he district court abused its discretion to the extent it certified classes and subclasses that include employees who signed class action waivers" where "Avilez's arbitration agreement does not contain a class action waiver and counsel did not dispute that those who signed such waivers have potential defenses that Avilez would be unable to argue on their behalf," such that Avilez was not an adequate or typical representative).

Plaintiffs raise several arguments in response.  First, they rely on two ERISA cases holding that the validity of releases need not be determined at the class certification stage and that the fact that some class members had signed releases did not defeat typicality or adequacy.  *In re Aquila ERISA Litig.*, 237 F.R.D. 202, 210–11 (W.D. Mo. 2006); *In re Williams Companies ERISA Litig.*, 231 F.R.D. 416, 423 (N.D. Okla. 2005).  Both cases relied in large part on the fact that the ERISA claims were being brought on behalf of the plan and "[a]s a matter of law, a plan participant cannot release the Plan's claims." *Aquila*, 237 F.R.D. at 210. Moreover, the Court is not deciding at this juncture whether the *Montoya* release is valid or precludes the claims of absent class members who agreed to the release. Instead, the Court finds that when the time comes to make that decision, Markson, McGeorge, and McClendon will not be typical or adequate representatives to make arguments about the validity and effect of the *Montoya* release because they— unlike virtually all of the absent class members—opted out of the settlement and have no stake in its application here.

Plaintiffs next argue that the *Montoya* settlement does not preclude certification because "Plaintiffs have brought PAGA claims against CRST which 1) were not included in the release in the *Montoya* settlement and 2) could not possibly been released by the *Montoya* settlement insofar as the class representatives in *Montoya* never had standing to bring PAGA claims."  Dkt. No. 482-1 at 22.  It is unclear what relevance this has to the Rule 23 analysis since, as Plaintiffs acknowledge elsewhere in their motion, "Plaintiffs do not seek class certification of the PAGA claims and their continued pursuit of those claims will be unaffected by the outcome of the instant Motion." *Id.* at 3.

Plaintiffs also rely on cases stating the general principle that "defenses that may bar recovery for some members of the putative class, but that are not applicable to the class representative do not render a class representative atypical under Rule 23." *Barnes v. AT & T Pension Benefit Plan-Nonbargained Program*,

270 F.R.D. 488, 494 (N.D. Cal. 2010); *see also Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 285 (N.D. Cal. 2016) ("[A] named plaintiff is not rendered inadequate merely because he or she is not subject to every affirmative defense that a defendant may assert against particular absent class members."). All of the cases on which Plaintiffs rely predate *Avilez* and *Lawson*, in which the Ninth Circuit held that the named plaintiffs (who had not signed class waivers) were not typical and did not adequately represent class members who had signed class waivers. Moreover, none of Plaintiffs' cases involved a situation like the one in this case, where nearly the entire class is subject to a settlement agreement from which the named Plaintiffs opted out. Under these circumstances, Plaintiffs are not typical representatives of their proposed class.

Finally, Plaintiffs attempt to distinguish the authorities cited by Defendants because many of the cases involve arbitration agreements. Of course, *Avilez* and *Lawson* involved class action waivers, not just arbitration agreements. But regardless, Plaintiffs have not shown why the logic for lack of typicality differs when the defense applicable to virtually all the class members except the named plaintiffs is an arbitration agreement rather than a class waiver or release. The district court in *Tan v. Grubhub, Inc.*, No. 15-CV-05128-JSC, 2016 WL 4721439 (N.D. Cal. July 19, 2016), in the decision that the Ninth Circuit affirmed in *Lawson*, did not distinguish between arbitration and class waivers, analyzing them together:

> Lawson is one of just two individuals in California to opt out of the class action waiver provisions. All other GrubHub drivers in California are potentially subject to some form of class action waiver as set forth in the GrubHub service agreements. Lawson therefore cannot satisfy either the typicality or adequacy requirements of Rule 23; that is, because Lawson is in a position unique from all but one other driver in California, his claims are not typical of the putative class members nor can he adequately represent the interests of those members, who are potentially bound by the arbitration and class action waiver provisions. For example, Lawson—having opted out of two separate agreements—would be unable to credibly make several procedural unconscionability arguments on behalf of unnamed class members, such as that delivery drivers felt compelled to accept the arbitration provisions as a condition of employment or that the opt-out provision was not sufficiently noticeable.

CV-90 (12/02)                   **CIVIL MINUTES – GENERAL**                   Initials of Deputy Clerk JGR

*Id.*, at \*3 (citations omitted).  The same logic applies equally here and compels the conclusion that Plaintiffs are not typical or adequate class representatives for the CRST Driver Class.

Plaintiffs attempt to circumvent this problem by seeking certification of the CRST 2013 Subclass, which essentially consists of members of the CRST Driver Class whose claims are related to the narrow time period between May 15, 2013 through January 21, 2014 (outside the *Montoya* class period) or who opted-out of the *Montoya* settlement.  Although the parties do not devote much attention to the subclass in their briefing, similar deficiencies preclude certification.  Plaintiffs have attempted to gerrymander a subclass of drivers not covered by the *Montoya* release by combining two distinct groups:  (1) drivers whose claims arose between May 15, 2013 and January 21, 2014 and (2) drivers who opted out of the *Montoya* settlement.  None of the named Plaintiffs claims to have worked for CRST in 2013 or 2014.  And nothing in the record suggests that any drivers who worked for CRST in 2013 or 2014 opted out of the *Montoya* settlement.  The drivers who opted out of the settlement—at most eight members of the CRST Driver Class—do not meet the numerosity requirement for certifying a class, and Plaintiffs cite no authority allowing them to circumvent this shortcoming by grouping themselves together with another distinct class (drivers with claims that arose between May 15, 2013 and January 21, 2014) to which none of the named Plaintiffs belongs. Accordingly, Plaintiffs have not met their burden of establishing that the proposed CRST 2013 Subclass satisfies Rule 23(a).

The Court therefore **DENIES** Plaintiffs' motion to certify the CRST Driver Class and the CRST 2013 Subclass.

## B.    Antitrust Class

In their second class certification motion, Plaintiffs seek to certify, with respect to their Sherman Act claim in Count One, a class consisting of "[a]ll current or former drivers 'under contract' as motor vehicle carrier drivers employed by defendants CRST International, Inc., CRST Expedited, Inc., C.R. England, Inc., or Stevens Transport, Inc. during the Class Period" (the Antitrust Class).  Dkt. No. 483 at 2.  They also seek to certify, for purposes of their Cartwright Act claim in Count Two, a subclass of members of the Antitrust Class who resided in California while "under contract" with one of the Defendants during the Class Period (the California Antitrust Subclass).  *Id.*  The term "under contract" is defined as "all current and former drivers who executed an agreement with defendants to work for any of the defendants for a specified period of time in

return for training provided by, funded by, or reimbursed by that defendant." *Id.* The Class Period is defined as from May 15, 2013 through the date of certification for class members employed by CRST and CRE and from April 15, 2015 through the date of certification for class members employed by Stevens. *Id.* The proposed class and subclass exclude "officers, directors, senior executives and personnel in the human resources or recruiting departments of the Defendants; and any and all judges and justices, and chambers' staff, assigned to hear or adjudicate any aspect of this litigation." *Id.*

"While there is no explicit requirement concerning the class definition in Rule 23, courts have held that the class must be adequately defined and clearly ascertainable before a class action may proceed." *Astiana v. Ben & Jerry's Homemade, Inc.*, No. C 10-4387 PJH, 2014 WL 60097, at \*3 (N.D. Cal. Jan. 7, 2014) (collecting cases). A class is ascertainable "if it can be identified 'by reference to objective criteria.'" *Steven Ades & Hart Woolery v. Omni Hotels Mgmt. Corp.*, No. 2:13-CV-02468-CAS, 2014 WL 4627271, at \*6 (C.D. Cal. Sept. 8, 2014) (quoting *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 593 (C.D. Cal. 2008)). Defendants do not dispute, and the Court finds, that the Antitrust Class and the California Antitrust Subclass are clearly defined and suffice "to allow a prospective plaintiff to identify himself or herself as having a right to recover based on the description," *id.*, at 7, and that class members can also be readily determined from Defendants' records. Thus, the class and subclass are ascertainable, and the Court must determine whether the requirements of Rule 23 have been satisfied.

### 1.     Rule 23(a)

"Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate. The Rule's four requirements—numerosity, commonality, typicality, and adequate representation—effectively limit the class claims to those fairly encompassed by the named plaintiff's claims. *Dukes*, 564 U.S. at 349 (cleaned up). "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id.* at 350. "[C]ertification is proper only 'if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied,'" and the court's "rigorous analysis" may "entail some overlap with the merits of the plaintiff's underlying claim." *Id.* at 350–51 (citation omitted). However, the Supreme Court

has also cautioned that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

       a.     Numerosity

Rule 23(a)(1) requires that a class be sufficiently numerous that it would be impracticable to join all members individually.  In determining whether a proposed class is sufficiently numerous to sustain a class action, the court must examine the specific facts because the numerosity requirement "imposes no absolute limitations." *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 330 (1980).  "In general, courts find the numerosity requirement satisfied when a class includes at least 40 members." *Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010).  Here, Plaintiffs estimate that the Antitrust Class includes approximately 76,000 members and the California Antitrust Subclass includes approximately 13,000 members.  Defendants do not dispute these estimates or contest numerosity.  As it would be impracticable to join thousands of members individually, the numerosity requirement is easily satisfied.

       b.     Commonality

Rule 23(a)(2) requires that questions of law or fact be common to the class. To satisfy the commonality requirement, the plaintiffs' claims "must depend upon a common contention," which "must be of such a nature that it is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Dukes*, 564 U.S. at 350.  "For purposes of Rule 23(a)(2), even a single common question will do." *Id.* at 359 (cleaned up).

"Where an antitrust conspiracy has been alleged, courts have consistently held that 'the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist.'" *Wortman v. Air New Zealand*, 326 F.R.D. 549, 556 (N.D. Cal. 2018) (quoting *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486 PJH, 2006 WL 1530166, at *3 (N.D. Cal. June 5, 2006)).  Here, several central questions—including whether Defendants conspired to avoid hiring each other's "under contract" drivers, whether the per se rule applies, and whether Defendants' anticompetitive behavior affected drivers' compensation—are common to all members of the Antitrust Class and the

California Antitrust Subclass.  The commonality requirement is therefore satisfied.[3]

> c.  Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical."  *Castillo v. Bank of Am., NA*, 980 F.3d 723, 729 (9th Cir. 2020) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998), *overruled on other grounds by Dukes*, 564 U.S. at 338).  "In antitrust cases, typicality usually will be established by plaintiffs and all class members alleging the same antitrust violations by defendants."  *Nitsch*, 315 F.R.D. at 284 (cleaned up).

The named Plaintiffs, like all other class members, "allege the same injuries arising from common conduct:  suppression of compensation due to Defendants' anti-solicitation agreements," which "is sufficient to satisfy the typicality requirement."  *Id.*  Defendants assert that Plaintiffs are not typical because all of STI's "under contract" drivers and most of CRE's "under contract" drivers during the Class Period are subject to arbitration agreements and class action waivers.  As discussed above in connection Plaintiffs' proposed California wage claims class, the general rule is that "defenses that may bar recovery for some members of the putative class, but that are not applicable to the class representative do not render a class representative atypical under Rule 23."  *Barnes*, 270 F.R.D. at 494; *accord Nitsch*, 315 F.R.D. at 284.  Unlike with the *Montoya* settlement that affects virtually all absent members of the proposed California wage class, Defendants do not dispute that many thousands of absent members of the Antitrust Class and the California Antitrust Subclass are—like named Plaintiffs—*not* subject to arbitration agreements or class action waivers.  Here as in *Nitsch*, "all class members were injured by the same alleged antitrust conspiracy and incurred the same alleged injury—suppressed compensation caused by Defendants' single antitrust

---

[3] Defendants briefly dispute commonality and typicality as part of their argument that the existence of arbitration agreements precludes certification under Rule 23(b)(3) because common issues do not predominate.  Dkt. No. 502 at 8.  That argument will be addressed in connection with typicality and with the requirements of Rule 23(b).

conspiracy. This is all that is required to show typicality." *Nitsch*, 315 F.R.D. at 284 (rejecting argument that named plaintiffs were not typical of class because some class members had arbitration or release agreements and named plaintiffs did not); *cf. Lawson*, 13 F.4th at 913 (affirming that representative was not typical where "[a]ll members of Lawson's putative class—except Lawson and one other—signed agreements waiving their right to participate in a class action"). Plaintiffs have therefore established typicality.

d.      Fair and Adequate Representation

Rule 23(a)(4) requires that the representative party "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Representation is adequate if the named plaintiffs and their counsel are able to prosecute the action vigorously and the named plaintiffs do not have conflicting interests with the unnamed class members. *Lerwill*, 582 F.2d at 512.

Plaintiffs have demonstrated both the inclination and the capability to vigorously prosecute this case through their participation in discovery and motions practice in the years since they filed suit. Defendants contend, however, that the named Plaintiffs are inadequate representatives because of litigation tactics that conflict with the interests of other class members and because they are not subject to arbitration agreements.

Relying on *DeSlandes v. McDonald's USA, LLC*, No. 17 C 4857, 2021 WL 3187668 (N.D. Ill. July 28, 2021), Defendants first argue that Plaintiffs have jeopardized the interests of absent class members by asserting only a per se antitrust violation and forgoing a claim under the rule of reason. In *DeSlandes*, after concluding that a class could not be certified because individual issues predominated, the court expressed its concern over plaintiff's counsel's waiver of a rule of reason claim:

> One unusual aspect of this case is that, while plaintiffs cannot prevail as class, they could lose as one. That owes to the fact that counsel for the named plaintiff made a strategic decision early in this case not to amend the complaint to add a claim under the rule of reason. If the Court certified a nationwide class . . . , it would be to the great detriment of the class. The class members would lose on a rule-of-reason claim, because their attorneys waived it [to pursue a "nationwide-class jackpot" that could yield them $913 million in fees] . . . . The reward to any given plaintiff would likely be quite similar

> whether he proceeded as part of a small, local class or a massive nationwide class.  Only the lawyers had something to gain by for[]going a claim under the rule of reason . . . .  Such a self-interested decision would not instill confidence that the attorneys would adequately represent the class.

*Id.*, at *14.

The claims in *DeSlandes* materially differed from Plaintiffs' challenge here because they challenged no-hiring provisions in franchise agreements, which in many markets were "merely vertical" and therefore "judged under the rule of reason."  *Id.*, at *10.  Significantly, the court had previously expressed skepticism about the plaintiffs' theory and allowed them the opportunity to amend to add a claim under the rule of reason, but they declined to do so.  Here, in contrast, Plaintiffs challenge horizontal no-hire agreements among competitors.  The Court denied Defendants' motions to dismiss and held that Plaintiffs have adequately alleged a per se violation, observing that "[c]ourts have concluded that no-poach agreements among competitors are per se violations of the Sherman Act."  Dkt. No. 381 at 6–7.  Thus, Plaintiffs' decision to pursue their claims exclusively under a per se antitrust theory does not raise the same adequacy concerns as in *DeSlandes*.

Defendants next argue that Plaintiffs' decision to employ a damages model that does not quantify damages for truckers who are "under contract" but no longer employed by a Defendant creates a conflict with class members who may be entitled to greater wages.  Plaintiffs seek more than $100 million in damages, and their strategic decision to tailor the relief they seek to the model they believe gives them the best chance of recovering does not, on this record, render them inadequate representatives.  *See B.P. v. Balwani*, No. 20-15974, 2021 WL 4077008, at *1 (9th Cir. Sept. 8, 2021) (unpublished) ("The district court did not err by concluding that plaintiffs dropped their emotional distress and subsequent medical treatment claims for the strategic benefit of the entire class, and there is no conflict of interest.").  Moreover, "[s]hould any absent class members prefer a different damages model, they remain free to opt-out of the class." *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 482–83 (N.D. Cal. 2020) (finding named plaintiffs to be adequate representatives and noting that courts of appeals have "warn[ed] against denial of class certification on the basis of speculative conflicts").

Defendants also argue that Plaintiffs' decision to move to certify a class comprised of only those drivers "under contract" with the remaining Defendants

who have not settled creates a conflict of interest with the drivers who were "under contract" with the Settling Defendants.  This argument is illogical and unsupported by authority.  Rule 23(a)(4) asks whether the named Plaintiffs "fairly and adequately protect the interests *of the class*."  Fed. R. Civ. P. 23(a)(4) (emphasis added).  Since the proposed class consists only of drivers who were "under contract" with CRST, CRE, and Stevens, any divergence of interests between the class members and drivers outside the class has no bearing on whether Plaintiffs adequately protect the interests of the class.[4]

Finally, relying solely on cases that involve neither antitrust claims nor conspiracies, Defendants summarily argue that Plaintiffs are inadequate class representatives because none of them were employed by Stevens and they are therefore not bound by Stevens's arbitration provisions and class action waivers.  *See, e.g.*, *Avilez*, 596 F. App'x at 579 ("To the extent the classes and subclasses include individuals who signed class action waivers, Avilez is not an adequate representative, Fed. R. Civ. P. 23(a)(4), and her claim lacks typicality, Fed. R. Civ. P. 23(a)(3).").  This argument may be moot in light of Plaintiffs' settlement with Stevens.  Regardless, it ignores the nature of antitrust conspiracy claims, which permit plaintiffs to recover from any conspiring defendant under joint and several liability.  *See In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 508 (S.D.N.Y. 1996) ("Plaintiffs need not have included among their proposed Class Representatives one individual who traded with each Defendant.  Because antitrust liability is joint and several, a Plaintiff injured by one Defendant as a result of the conspiracy has standing to represent a class of individuals injured by any of the Defendant's co-conspirators."); *Nitsch*, 315 F.R.D. at 314 ("In contrast to a single-defendant case, joint and several liability among Defendants here means that a class member who has signed a release against one Defendant is not precluded from pursuing this action against the other Defendants.").

Accordingly, the Court finds that the named Plaintiffs adequately and fairly represent the interests of the Antitrust Class and the California Antitrust Subclass.  Of course, any class members who disagree that Plaintiffs adequately represent

---

[4] Plaintiffs have filed a motion for preliminary approval of their class action settlements with the Settling Defendants.  Dkt. No. 537.  In assessing that motion, the Court addresses whether Plaintiffs adequately represent the interests of the class members in the broader settlement class.  However, that is a separate inquiry from whether they adequately protect the interests of the Antitrust Class and the California Antitrust Subclass.

their interests remain free to opt out.  *See Matamoros v. Starbucks Corp.*, 699 F.3d 129, 139 (1st Cir. 2012) ("The availability of this [opt-out] option is an important factor in weighing the effect of a largely hypothetical conflict on a class-certification decision.").

## 2.      Rule 23(b)(2)

Because Plaintiffs have satisfied the four requirements of Rule 23(a), the Court next turns to Rule 23(b).  Plaintiffs invoke both Rule 23(b)(2), which permits certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," and Rule 23(b)(3), which permits certification where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b).

Plaintiffs devote only a page of their motion to arguing that Rule 23(b)(2) has been satisfied.  "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Dukes*, 564 U.S. at 360 (internal quotation marks omitted).  "The rule does not require [courts] to examine the viability or bases of class members' claims for declaratory and injunctive relief, but only to look at whether class members seek uniform relief from a practice applicable to all of them."  *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010).

Plaintiffs argue that they "seek uniform relief, namely, that defendants be enjoined from refusing to hire drivers on the basis that they are 'under contract' with another defendant."  Dkt. No. 485-1 at 11.  While Plaintiffs are correct that this proposed injunction is the sort of uniform relief that could be applied to all class members, Defendants challenge Plaintiffs' standing to seek it.  "Unless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief."  *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999).  A plaintiff seeking injunctive relief "must demonstrate that he has suffered or is threatened with a 'concrete and particularized' legal harm, coupled with 'a sufficient likelihood that he will again be wronged in a similar way,'" which requires him to "establish a 'real and immediate threat of

repeated injury.'" *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (citations omitted).

Defendants argue that "[n]o Plaintiff has shown any intent to seek employment with any Defendant in the future and no Plaintiff would be denied employment for being 'under contract' because it has been more than three years since they worked for a Defendant, so a prospective employer would not verify employment with a Defendant." Dkt. No. 502 at 24. Thus, Plaintiffs are not reasonably likely to be rejected from employment based on their "under contract" status with another Defendant. Plaintiffs respond that Defendants are "wrong both legally and factually," but they present no evidence that any named Plaintiff intends to seek employment with any Defendant in the future. Dkt. No. 514 At 15. Accordingly, even assuming Plaintiffs could establish that Defendants would refuse to hire them *if* they applied for employment, they have not shown a real and immediate threat of repeated injury. Simply put, Plaintiffs have no need for an injunction regarding Defendants' hiring practices if Plaintiffs have no intention of seeking employment with Defendants. *See Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 865 (9th Cir. 2017) ("[A] former employee has no claim for injunctive relief addressing the employment practices of a former employer absent a reasonably certain basis for concluding he or she has some personal need for prospective relief."). Because no named Plaintiff has established standing to pursue injunctive relief, Plaintiffs are not entitled to certification under Rule 23(b)(2).

### 3.    Rule 23(b)(3)

As observed above, Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Defendants focus their opposition to certification on a series of arguments challenging Plaintiffs' ability to satisfy the predominance requirement.

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof. What the rule does require is that common questions *predominate* over any questions affecting only individual class members." *Amgen*, 568 U.S. at 469 (cleaned up). Moreover, "Rule 23(b)(3)

requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Id.* at 459.  The rule requires courts to "take a close look at whether common questions predominate over individual ones." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34, (2013) (cleaned up).

"Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws." *Amchem*, 521 U.S. at 625; *cf. Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 167 (C.D. Cal. 2002) ("In price-fixing cases, 'courts repeatedly have held that the existence of the conspiracy is the predominant issue and warrants certification even where significant individual issues are present.'" (quoting *NASDAQ*, 169 F.R.D. at 518)).  However, certification is not automatic.  *See Comcast*, 569 U.S. 27 (reversing class certification in antitrust suit where damages model did not satisfy predominance test).

When performing the predominance analysis, a court must "begin[] . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).  The elements of an antitrust claim under the Sherman Act are "(1) violation of antitrust law; (2) injury—or 'impact'—resulting from that violation; and (3) measurable damages." *In re Aftermarket Auto. Lighting Prod. Antitrust Litig.*, 276 F.R.D. 364, 368 (C.D. Cal. 2011).[5]

#### a.  Antitrust Violation

To establish a violation of Section 1 of the Sherman Act, "a plaintiff must show that: '(1) there was an agreement, conspiracy, or combination between two or more entities; (2) the agreement was an unreasonable restraint of trade under either a per se or rule of reason analysis; and (3) the restraint affected interstate commerce.'" *In re High-Tech Emp. Antitrust Litig.* (*High-Tech II*), 985 F. Supp. 2d 1167, 1187 (N.D. Cal. 2013) (quoting *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir. 1996)).  Antitrust claims are generally susceptible to

---

[5] The parties agree that California's Cartwright Act tracks federal law and that Plaintiffs' claims under both the Sherman Act and the Cartright Act are based on the same allegedly anticompetitive behavior and seek the same relief.  Dkt. No. 485-1 at 13 n.3; Dkt. No. 502 at 7.  The parties therefore have not addressed the claims separately, and neither will the Court.

classwide proof because "[t]he violation turns on *defendants'* conduct and intent along with the effect on the market, *not* on individual class members." *Glumetza*, 336 F.R.D. at 475 (citing *Alaska Airlines v. United Airlines*, 948 F.2d 536, 540 (9th Cir. 1991)).

To prove the existence of an antitrust conspiracy, Plaintiffs rely on both direct evidence—conversations between Defendants confirming their agreements not to hire truckers under contract with each other—and circumstantial evidence, especially the expert testimony of Einer Elhauge, who opines on the market dynamics and concludes that Defendants' independent economic incentives would have led them to poach each other's "under contract" drivers in the absence of a contrary agreement.  Both types of evidence apply to the claims of all class members.  Defendants briefly contend that differences in their notice letters and practices in sending notice letters preclude a finding that common issues predominate, but the question whether Defendants agreed not to hire each other's "under contract" drivers does not turn on the precise nature of their contracts with the drivers, and the Court finds that the existence of an agreement will overwhelmingly be proven (assuming it is proven) by classwide proof.  Moreover, "the decision of what mode of analysis to apply—per se, rule of reason, or otherwise—is entirely a question of law for the Court," *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1010 (N.D. Cal. 2008), and determining whether the agreement was per se unreasonable and whether it impacted interstate commerce will turn on evidence common to the class.

Defendants also challenge the adequacy of Elhauge's expert opinions, contending that he "fails to provide any genuine economic analysis."  Dkt. No. 502 at 8.  But to the extent Elhauge's analysis is deficient (an issue on which the Court makes no finding), it is equally deficient as to all class members.  "When, as here, the concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity—an alleged failure of proof as to an element of the plaintiffs' cause of action—courts should engage that question as a matter of summary judgment, not class certification." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 457 (2016) (cleaned up).

Finally, Defendants argue that the existence of arbitration agreements and class action waivers signed by many of the absent class members forecloses Plaintiffs' ability to satisfy predominance (along with commonality and typicality). As already discussed, because plaintiffs who establish an antitrust conspiracy can recover from any conspiring defendant under joint and several liability, the arbitration agreements and class waivers do not foreclose class members' ability to

recover from Defendants with which they did not sign agreements.  *See NASDAQ*, 169 F.R.D. at 508; *Nitsch*, 315 F.R.D. at 314.  Accordingly, Defendants have not shown that litigation of individual issues related to the arbitration agreements is likely to predominate over classwide liability issues.

As to the existence of an antitrust violation, the Court finds that Rule 23(b)(3) is satisfied because "questions of law or fact common to class members predominate over any questions affecting only individual members."

　　　　b.　　　Antitrust Impact and Measurable Damages

The final two elements of an antitrust claim—antitrust impact and measurable damages—are closely related, and Plaintiffs rely on the expert testimony of Dr. Edward Leamer to establish both.  Defendants, relying largely on the testimony of their own expert, Dr. Timothy Snail, vigorously dispute the validity of Dr. Leamer's methodology and opinions.

"Antitrust impact—also referred to as antitrust injury—is the fact of damage that results from a violation of the antitrust laws.  It is the causal link between the antitrust violation and the damages sought by plaintiffs." *In re High-Tech Emp. Antitrust Litig.* (*High-Tech I*), 289 F.R.D. 555, 565–66 (N.D. Cal. 2013) (citations and internal quotation marks omitted).  "[A]t least five circuit courts and at least two district courts within this district have held that, for cases involving antitrust violations, common issues do not predominate unless the issue of impact is also susceptible to class-wide proof." *Id.* at 566 (collecting cases).

"Besides demonstrating antitrust impact through common proof, Plaintiffs must supply a reliable methodology for measuring damages on a classwide basis." *Tawfilis v. Allergan, Inc.*, No. 815CV00307JLSJCG, 2017 WL 3084275, at *11 (C.D. Cal. June 26, 2017) (citing *Comcast*, 569 U.S. at 35; *Doyle v. Chrysler Grp., LLC*, 663 F. App'x 576, 579 (9th Cir. 2016)).  "[T]he need for individualized findings as to the amount of damages does not defeat class certification." *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016).  However, "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory." *Comcast*, 569 U.S. at 35.  "Calculations need not be exact, but at the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.'" *Id.* (citations omitted).   "[W]hen there is a battle of the experts on class certification, 'rigorous analysis' requires district courts to determine not only

admissibility of the experts' statements, but also the 'persuasiveness of the evidence presented.'" *High-Tech II*, 985 F. Supp. 2d at 1184 (quoting *Ellis*, 657 F.3d at 982).  But "the issue at class certification is not which expert is the most credible, or the most accurate modeler, but rather have the plaintiffs demonstrated that there is a way to prove a class-wide measure of [impact] through generalized proof.  Merits questions can be resolved at trial." *Wortman*, 326 F.R.D. at 559 (citations omitted).

Based on economic theory and statistical analysis, Dr. Leamer in a 72-page declaration opines that classwide evidence shows that Defendants' agreement not to hire each other's "under contract" drivers suppressed wages in a way that impacted all or almost all class members, and that damages can be quantified systematically by a classwide methodology based on the difference in the per-mile pay rate used by CRST to compensate "under contract" drivers and noncontract drivers.  Dkt. No. 485-3.  Relying on the 89-page declaration of Dr. Snail, Dkt. No. 506-1, Defendants raise a host of challenges to Dr. Leamer's methodology and findings, including the following arguments:  (1) Dr. Leamer's analysis fails to isolate the impact of the horizontal no-hire agreement among Defendants from the impact of other conduct including the non-competition agreements in the vertical contracts between Defendants and their drivers; (2) Dr. Leamer has not explained why the impact of rejections from Defendants is different from the impact of non-conspiring employers refusing to hire applicants who are "under contract" with Defendants; (3) Defendants' "under contract" drivers represented less than 1% of the drivers in the market, so it is implausible that Defendants' conspiracy could suppress wages at more than 100,000 other employers of truck drivers; (4) the record evidence establishes that class members have access to enormous amounts of information about jobs and wages, contrary to Dr. Leamer's conclusion; (5) "under contract" drivers have substantial mobility and frequently change employers to obtain higher wages, contrary to Dr. Leamer's conclusion; (6) Dr. Leamer's damages model fails to account for benefits and compensation other than per-mile pay that offset the lower wages CRST pays to "under contract" drivers; (7) Dr. Leamer ignores the fact that CRE and Stevens, unlike CRST, pay their "under contract" drivers and noncontract drivers at the same rate based on experience and position; (8) Dr. Leamer's single-metric damages model fails to account for significant differences in how Defendants' pay their drivers, including many drivers who are not paid by the mile at all; (9) Dr. Leamer's assumption that "under contract" drivers would be paid the same per mile compensation as noncontract drivers in the hypothetical "but for" world (in which Defendants did not conspire together) is unsupported by and contrary to the evidence; and (10) Dr.

Leamer has failed to show any basis for applying the CRST pay scale differential as a damages model for drivers employed by CRE and Stevens.

Together with their reply brief, Plaintiffs filed a 51-page rebuttal declaration by Dr. Leamer, responding to each of Defendants' criticisms.  Dkt. No. 524.  Although the Court finds Dr. Leamer's rebuttal persuasive on some points, it is unnecessary for the Court to resolve each of the disputed issues, because even assuming that Dr. Leamer has otherwise demonstrated some degree of antitrust impact, the Court is not persuaded that he has shown "a reliable methodology for measuring damages on a classwide basis."  *Tawfilis*, 2017 WL 3084275, at *11.

Dr. Leamer based his damages model on the fact that Defendants primarily compensate drivers for miles driven using uniform pay rates set by Defendants that specify a per-mile rate derived from the driver's experience and whether the driver is driving solo or as part of a team.  Dkt. No. 485-3 ¶ 56.  CRST's pay scale rates for drivers with the same experience level differ depending on whether the driver is "under contract."  *Id.* ¶¶ 57, 102.  Dr. Leamer concluded that this pay scale differential reflects the compensation suppression caused by the no-hire conspiracy among Defendants and can therefore be used as a benchmark for quantifying the wage suppression experienced by drivers employed by all Defendants as a result of the antitrust violation.  *Id.* ¶¶ 103–17.  Accordingly, Dr. Leamer calculated an estimate of lost earnings of "under contract" drivers by taking their pay scale differential specific to their experience level for each month and multiplying it by the number of miles driven in that month and then aggregating the data to compute "one overall damage percent for each pay scale period," which he asserts can then be applied mechanically to calculate damages for each class member.  *Id.* ¶¶ 118–20.

Dr. Snail raises serious questions about Dr. Leamer's analysis.  The key problem with Dr. Leamer's methodology, however, is that, both CRE and Stevens use pay scales that *do not* differentiate between "under contract" and noncontract drivers.  *Id.* ¶ 112.  Dr. Leamer contends that this does not mean compensation was not suppressed at CRE and Stevens, but rather that because "contract drivers accounted for the overwhelming majority of [CRE's and Stevens's] wages paid to inexperienced drivers during the Class period," the noncontract drivers were insignificant in CRE's and Stevens's pay calculations, and wages for all drivers were suppressed in a highly coordinated market.  *Id.* ¶ 113.  But Dr. Leamer also indicates that "under contract" drivers were "the overwhelming majority of CRST's inexperienced workforce," just like at CRE and Stevens.  *Id.* ¶ 107.  If the pay scale differential at CRST is probative evidence of antitrust impact, the lack of

a pay scale differential at CRE and Stevens under similar circumstances presumably would be equally probative evidence of the lack of antitrust impact. Similarly, if the gap between the pay for "under contract" drivers and contract drivers at CRST provides a reliable measure of wage suppression at CRST, then the gap between the pay for "under contract" drivers and noncontract drivers at CRE and Stevens (zero) presumably would provide a reliable measure of wage suppression at CRE and Stevens (also zero). Dr. Leamer has not provided a persuasive explanation for why a uniform model of damages that can be applied classwide should be based only on the pay differential at the sole Defendant whose data supports Plaintiffs' theory.

Accordingly, the Court is unpersuaded that Plaintiffs have met their burden to produce a reliable damages model that can be uniformly applied to all Defendants, particularly since the "benchmark" of pay suppression on which they rely is wholly absent from two of the three Defendants. *See High-Tech II*, 985 F. Supp. 2d at 1184 (explaining that as part of their "rigorous analysis," courts must evaluate the "persuasiveness of the evidence presented" (quoting *Ellis*, 657 F.3d at 982)). Plaintiffs therefore have not shown that class issues predominate over individual issues so as to permit certification of either the Antitrust Class or the California Antitrust Subclass under Rule 23(b)(3).[6]

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** both of Plaintiffs' motions for class certification.

---

[6] The Court therefore need not determine whether a class action would be superior to other available methods for fairly and efficiently adjudicating the controversy under Rule 23(b)(3), nor whether to appoint class counsel under Rule 23(g).